```
 1                    IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF CALIFORNIA
 2

      BRIANNA BOLDEN-HARDGE,
 3           Plaintiff,

                                      Sacramento, California
 4     vs.                            No. 2:20-cv-02081-JAM-DB
                                      Tuesday, March 23, 2021
 5     OFFICE OF THE CALIFORNIA       1:33 p.m.
       STATE CONTROLLER,
 6           Defendant.
       _____/
 7
                         TRANSCRIPT OF PROCEEDINGS
 8                       MOTION TO DISMISS HEARING
           BEFORE THE HONORABLE JOHN A. MENDEZ, DISTRICT JUDGE
 9              (Proceedings held via videoconference.)
                              ---oOo---
10    APPEARANCES:

11      For the Plaintiff:            STANFORD LAW SCHOOL RELIGIOUS
                                      LIBERTY CLINIC
12                                    559 Nathan Abbott Way
                                      Stanford, CA  94305
13                                    By:  JAMES ANDREW SONNE
                                             ZEBA HUQ
14                                    Attorneys at Law
                                           HENRY KOLLER, student
15                                         MATTHEW DIMON, student

16                                    LAW OFFICES OF WENDY MUSELL
                                      180 Grand Avenue, Suite 1300
17                                    Oakland, CA  94612
                                      By:  WENDY ELLEN MUSELL
18                                    Attorney at Law

19      For the Defendants:          CALIFORNIA DEPARTMENT OF
                                     JUSTICE
20                                   1515 Clay Street
                                     Oakland, CA  94612
21                                   By:  KELSEY CATHERINE LINNETT
                                     Attorney at Law
22
       Official Court Reporter:      Thresha Spencer,
23                                   CSR, RPR
                                     501 I Street
24                                   Sacramento, CA 95814

25     Proceedings recorded by mechanical stenography, transcript
       produced by computer-aided transcription
```

1        SACRAMENTO, CALIFORNIA, Tuesday, March 23, 2021, 1:14 PM

2                              --o0o--

3   (In open court.)

4            THE CLERK:  Please come to order.  Court is now in

5   session.  The Honorable John A. Mendez, United States District

6   Court Judge, presiding.  Calling civil case 20-2081,

7   Bolden-Hardge versus Office of the California State Controller,

8   et al.

9            THE COURT:  All right.  Good afternoon.  If you could

10   state your appearances, please.  We'll start with the

11   plaintiffs.

12            MR. SONNE:  Good afternoon, your Honor.  Jim Sonne

13   for Bolden-Hardge.

14            MS. HUQ:  Good afternoon, your Honor.  Zeba Huq for

15   Plaintiff Brianna Bolden-Hardge.

16            MS. MUSELL:  Good afternoon, your Honor.  Wendy

17   Musell on behalf of plaintiff.

18            THE COURT:  Next?

19            MR. KOLLER:  Good afternoon, your Honor.  Henry

20   Koller on behalf of Plaintiff Brianna Bolden-Hardge.

21            THE COURT:  One more.  Any other lawyers for the

22   plaintiff?

23            MR. DIMON:  Good afternoon, your Honor.  Matthew

24   Dimon for Plaintiff Brianna Bolden-Hardge.

25            THE COURT:  Okay.  For the defendant?

1            MS. LINNETT:  Good afternoon, your Honor.  Kelsey

2    Linnett, Deputy Attorney General, on behalf of Office of the

3    State Controller and the State Controller.

4            THE COURT:  Okay.  We have two other individuals.

5    Who are they?  Is that the other case?

6            THE CLERK:  Yes.

7            THE COURT:  Can you eliminate them?

8        Mr. Sonne, are you going to be the primary spokesman for

9    the plaintiff?

10           MR. SONNE:  Yes, your Honor.  I've asked our

11   certified law students to address just two small matters at the

12   end, if that would be okay with the Court?

13           THE COURT:  What are the two small matters?

14           MR. SONNE:  The implications of the recent Supreme

15   Court case on nominal damages of 1983, and then the additional

16   accommodations made by other state agencies.

17           THE COURT:  Okay.  Ms. Linnett, are you okay five

18   against one?  Can you handle it?

19           MS. LINNETT:  I think so.

20           THE COURT:  Okay.  If you haven't appeared in my

21   court before, it's not a usual oral argument in any respect.  I

22   simply will ask questions.  I don't simply allow just argument.

23   And once the questions are answered, I'll be able to give you a

24   ruling this afternoon.  But that's really the purpose as far as

25   I'm concerned in terms of oral argument or a hearing on motions

1   to dismiss.

2       It's an interesting case and the briefing was excellent,

3   and I do appreciate having students involved in these types of

4   cases and giving them an opportunity to at least participate in

5   a hearing on a motion.  It's a really good opportunity to

6   really see how it's going to be once you pass the bar and

7   become lawyers.

8       Mr. Sonne, let me get to the -- I think the guts of this

9   case and where I'm having issues with the case itself.  And I

10  want to focus first on your client's first three claims.  I'll

11  come back to the constitutional claims and the fourth and fifth

12  claims after we go through the first three claims of the Title

13  VII claims and the FEHA claim.

14      The first issue is whether there really is a conflict --

15  although you argue that the defendant seems to concede that --

16  the defendant clearly doesn't concede that there is a conflict

17  here, and the defendant argues that there is no actual

18  conflict.

19      And then the second equally-significant issue is your

20  argument that Title VII trumps the California State

21  Constitution.  And it's an interesting argument which appears

22  to me to have little or absolutely no support in the law.  And,

23  to your credit, you find some authority, what you call

24  authority, but the EEOC decisions that -- you discuss it and

25  rely on.

1       But I think you're well aware that the EEOC decisions are

2   clearly not binding precedent, really carry no weight in a

3   Federal District Court, and it's always interesting to me that

4   you use the word "trump" rather than "preempt."  But, in

5   effect, what you're arguing is Title VII preempts the

6   California State Constitution.

7       And if you're going to ask a Federal District Court to, in

8   effect, preempt, to find that Title VII trumped or does trump a

9   practice -- a lawful practice embedded in a state constitution,

10  I just think you need more.  You need a lot more than what

11  you've argued.  And without that trumping of the California

12  Constitution in this case, a requirement imposed by the

13  California Constitution that this oath has to be taken by

14  everyone -- or most everyone who is going to work for the

15  state -- you can't succeed on the Title VII claims.

16      So that's my first big question after reading the briefs.

17  I don't see how I can find in your favor on that critical issue

18  to your client.  I don't see any basis for me holding that

19  Section 708 or Title VII trumps the state oath requirement.

20      It's all yours.

21          MR. SONNE:  Your Honor, if I may.  I have essentially

22  three responses to your two questions.  The first is on the

23  conflict point.  In accordance with the Supreme Court's recent

24  *Abercrombie* decision and established case law, we do plead a

25  prima facie case.  We allege the defendants refused our client

1    a job because a conflict between, on one hand, a sincerely held

2    religious belief in needing to include a clarifying statement

3    upon signing the state loyalty oath.  And, on the other hand,

4    the state's insistence on the oath without such a statement.

5    Defendants nowhere challenged our prima facie case in their

6    motion.

7              THE COURT:  No, they did.  I would disagree with you.

8    They absolutely challenged it.  I know you claim that, and

9    that's what I said initially.  You claim and you argue they

10   haven't challenged that you pled a prima facie case, but they

11   do.  They challenge the fact that you haven't pled that there

12   is an actual conflict here.

13       Your client, at least according to the defendants, created

14   the conflict by trying to add an addendum to an oath, and

15   there's no case law that supports a finding by a Court that,

16   under that situation, that there is an actual conflict.  And

17   *Smith* is a terrible case for you.  I know you try to

18   distinguish it, but *Smith* doesn't help you at all, and that's

19   the only real case that gives me some guidance here under these

20   circumstances.  I don't have any other Court that's found when

21   it's the plaintiff who's suggesting an addendum or a

22   modification.  In effect, your client is creating the conflict,

23   but there's no real conflict between that oath and the

24   requirement you take that oath and her ability to do her job.

25       The oath in no way, at least according to *Smith* as well, in

1   any way impacts her ability to exercise her religious beliefs.

2   It just doesn't.  And it's your client who is trying to create

3   the conflict.  That's at least the way I read the cases, and I

4   don't see anything on your side that contradicts that.

5           MR. SONNE:  Your Honor, the conflict is between what

6   the oath is requiring our client to say in order to work for

7   the state and our client's sincerely held religious beliefs,

8   and those beliefs, which are outlined in the complaint, and

9   specifically in paragraph 28, which stated that "Bolden-Hardge

10  sincerely believes that the language in the prescribed oath --

11  including swearing faith and allegiance to the state and

12  swearing to 'defend against all enemies, foreign and

13  domestic' -- would require her to put her allegiance to the

14  government over her allegiance to God and likewise commit her

15  to take up arms in defense of the state in violation of her

16  sincerely held religious beliefs."

17      That conflict -- yes, you need a conflict.  So you need one

18  side saying "sign the oath or no job," the other side saying "I

19  have a sincerely held religious belief that requires me to

20  append a statement."  And I'll get to *Smith* in a second.

21      But that conflict is stark relief.  It's why, for example,

22  other agencies offer the very accommodation that our client is

23  seeking.  It's why the Governor said, in vetoing the bill, that

24  FEHA requires accommodation in these situations.

25          THE COURT:  Let me also comment on that.

1              MR. SONNE:  There will be no reason for any of these

2    accommodations if there was no such conflict.

3              THE COURT:  Let me comment also on your argument

4    about Schwarzenegger's note, or whatever he wrote with respect

5    to the veto of that law.  And that is, again, that doesn't help

6    you at all.  It's not authority.  I can't, as a judge, base a

7    decision on the fact that Arnold Schwarzenegger wrote

8    something.  You know as well as I do that's not Ninth Circuit

9    Court of Appeal District Court law that I can base a decision

10   on.  It's a gratuitous comment.

11       And what sticks with me is I think you need to address

12   *Smith* because I don't think you actually distinguished it in

13   your brief, and I'll give you another shot.  But the statement

14   where the Court of Appeals writes that, in *Smith*, that the

15   appellant is "gratuitously injecting his religious beliefs into

16   the governmental process, the very subject into which the

17   organic law forbids inquiry by the government."

18       That's this case in a nutshell, and I don't think you've

19   been able to distinguish *Smith* from your client's case.  She's

20   gratuitously injecting her religious beliefs.  They're sincere,

21   I absolutely believe that.  She's sincere.  But again, I go

22   back to it's a gratuitous injection; it's not an actual

23   conflict.

24              MR. SONNE:  Your Honor, if I may.  First, in terms of

25   the Ninth Circuit, in terms of -- to the extent that the oath

THRESHA SPENCER, OFFICIAL COURT REPORTER, USDC

1    is required, *Sutton* and *Boateng* both say that in the Ninth

2    Circuit we look to any such legal requirement would be a

3    hardship inquiry, not a prima facie case inquiry.

4              THE COURT:  Both those cases involve -- sorry.  Both

5    those cases involve conflicts between Title VII and other

6    federal laws, correct?  Not Title VII and state.

7              MR. SONNE:  *Sutton* does.  *Sutton* does, yes, your

8    Honor.

9              THE COURT:  Okay.

10             MR. SONNE:  And if I may.  In terms of the -- in

11   terms of the preemption -- well, I'll address your *Smith*

12   question first and then --

13             THE COURT:  Yeah, you need to address *Smith*.

14             MR. SONNE:  Yes, your Honor.

15             THE COURT:  Is there anything more you want to add in

16   terms of why you think I shouldn't just follow *Smith* here?

17             MR. SONNE:  Well, first of all, there is no -- there

18   is no FEHA claim made in *Smith*, so there was no -- there is no

19   argument that, notwithstanding the oath's language that a

20   religious accommodation was required, there would be under

21   FEHA, there is certainly no Title VII claim involved nor was

22   there any constitutional claim.

23       What's more, *Smith* was decided on a full and complete

24   administrative record.  This is on pleadings we have here.  So

25   that distinguishes Smith.

 1        In terms of the oath itself and the objection, the employee

 2   in Smith asks to -- asks to apply a statement that said, among

 3   other things, that he declared his supreme allegiance to the

 4   Lord Jesus Christ and Almighty God as the ruler of nations and

 5   expressed his dissent..."

 6        THE COURT:  If you're just going to repeat what's in

 7   *Smith*, then you can assume I've read it in detail and I know

 8   your argument.

 9        My question more is, is there anything you want to add to

10   the arguments in your brief?

11        MR. SONNE:  Well, I'd also like to add the fact --

12   well, not only the factual distinguishing factors between what

13   was asked for in *Smith* and what we have here, but I would also

14   then return to the preemption point, which, as your Honor

15   notes, the USC has made clear in any case, it's Section 703 --

16   708, excuse me, "demands that a religious accommodation

17   requirement trumps state law when it comes to loyally oaths."

18   The USC specifically said you have to show actual hardship, not

19   just per se hardship.

20        And I might add that in our complaint we cite Judge Shubb's

21   ruling in the *Bessard* case, that is at 867 F. Supp. 1454.  And

22   that's quite significant because the Court -- this very Court

23   stressed in the context of this very oath, that that oath --

24   that the oath requirement in the state constitution must yield

25   to federal law, and that any argument the state law forbids

1   modification to the oath cannot insulate -- cannot insulate the

2   state from having justified its requirements under state law.

3              THE COURT:  Where is that discussed in your brief?

4              MR. SONNE:  Your Honor, it was a RFRA case, and it's

5   in our complaint.

6              THE COURT:  No.  Don't -- try to answer my question,

7   okay?  Where is that discussed in your brief?

8              MR. SONNES:  It's not discussed in our brief.

9              THE COURT:  So how can you raise it?  You can't raise

10  that argument in an oral argument.  That's not fair to the

11  defendant.

12             MR. SONNE:  Well, I appreciate that, your Honor.  It

13  was an oversight.  In preparing for this oral argument, we have

14  it in our complaint.  It's alleged in our complaint, and we

15  specifically said it in our complaint, so it is before the

16  Court.

17             THE COURT:  It's not before the Court.  This is a

18  motion to dismiss.  It's not discussed in the briefs.  It

19  absolutely is not before the Court.  You can't raise new

20  arguments that haven't been raised in your opposition.

21      So I can't -- again, I can't rely on that type of argument,

22  especially if it's that critical to your opposition and it

23  should have been discussed, right?

24             MR. SONNE:  Your Honor, I appreciate that.  I'm just

25  responding to your Honor's asking, "Do you have anything more?

1    Is there anything more you haven't told me?"  And that's what

2    I'm sharing with you, and it was in our complaint, and it was

3    not in our briefing.  And we'd be happy to submit, you know, a

4    supplemental discussion of that.  But I'm trying to describe to

5    the Court what our position is consistent with 708, consistent

6    with the EEOC's position that you have to show actual hardship.

7    You cannot just rely on its own state's loyalty oath and what

8    the interpretation that the state might have in terms of *Smith*.

9         So whether it's the *Bessard* case, whether it's 708 itself,

10   whether it is the EEOC's ruling, I'm just sharing with you

11   where that comes from.

12        And that is why, for example, given the supremacy of Title

13   VII, it is unsurprising that the per se hardship cases that are

14   relied on by defendants conflict with federal law, as your

15   Honor pointed out.  *Sutton*, *Seaworth*, *Tagore*.  These are all

16   federal law conflicts.

17        When it comes to state law, we require actual hardship

18   findings.  In fact, *Boateng* itself looks at actual hardship in

19   ruling on summary judgment -- not on the pleadings -- the

20   summary judgment, and there's actual findings of hardship in

21   that case.

22        There's no case that the state can point to that says when

23   you have a conflict as to oaths, you automatically go with what

24   the state says as opposed to what Title VII civil rights law

25   says.

1      If the situation were otherwise, the states could easily

2   avoid its civil rights obligation.

3          THE COURT:  You understand --

4          MR. SONNE:  -- by Judge Shubb -- sorry, excuse me.

5          THE COURT:  You understand for purposes of this

6   motion to dismiss the states raise a purely legal issue in

7   terms of actual or undue hardship.  And their argument is

8   simply, it's a hardship to require the state to break the law.

9   That's what your client is asking the agency, the State Office

10  of the Controller to do, to break the law, to violate the

11  Constitution.

12      And so the legal question is, you know, is that, in fact, a

13  legal defense to this?  And again, your response to that is,

14  well, we're not asking the state to break the law, to violate

15  the Constitution because Title VII trumps the Constitution in

16  this situation.  So we're sort of going in circles here, but

17  that goes back to your argument, where is the authority that

18  you cited that says, in fact, that Title VII trumps this state

19  constitutional mandate?

20      Because I think clearly, as a matter of law, I don't think

21  you disagree that if you're asking someone to -- an agency to

22  break a law, that is an undue hardship.  You can't ask the

23  state to do that absent, again, some preemption, some basis for

24  the state to say, "We have to violate the constitution, our

25  constitutional oath, our constitutional requirements to

1    accommodate this woman."

2        And again, I come back to my first question.  I don't see

3    authority, I don't feel comfortable in finding and writing an

4    opinion that says, "Clearly, clearly Title VII trumps the

5    California Constitution under these circumstances," because no

6    case has said that.

7            MR. SONNE:  Your Honor, but no case -- but we have

8    708 itself.  The statute itself says that.

9            THE COURT:  It doesn't say that.  It clearly doesn't

10   say that.

11           MR. SONNE:  Your Honor -- I'm sorry?

12           THE COURT:  708 does not say that Title VII trumps or

13   preempts the California State Constitution or state

14   constitutional requirements.

15           MR. SONNE:  Your Honor, 708 says if there is "Any

16   such law which purports to require or permit them doing of an

17   act which would be an unlawful employment practice under this

18   title."  That's what it says.  It says that there would be an

19   unlawful employment practice.  If the state said we think that

20   we should discriminate against a protected category, Section

21   708 said he can't.  And will the definition of religion under

22   703(j) -- 701(j) includes an accommodation requirement.

23       So the refusal to accommodate is a form of disparate

24   treatment.  *Abercrombie* made that clear, it is a form of

25   disparate treatment.  We would never tolerate a state saying,

1   "Oh, well, we think that under our constitution or our state

2   law we get to discriminate."  No, 708 says that you can't do

3   that.

4       And I would also just quickly add that even when we look at

5   the state law itself in terms of whether or not there would be

6   a breaking of the law, we see that the constitutional language

7   does not prevent any type of statement.  Other agencies allow

8   the type of statement that our client was proposing.  The

9   Attorney General itself -- Attorney General Brown, in fact,

10  wrote an accommodation for a party which made similar

11  promise -- sort of similar guarantees in terms of things like

12  the taking up of arms.

13      So we don't have a violation of law here.  Even if we were

14  to go that route, even if we were to ignore 708, to ignore what

15  the EEOC has said, to ignore *Bessard*.

16      So I think it's really important that all these things fit

17  together --

18              THE COURT:  I don't understand --

19              MR. SONNE:  -- and we have civil rights law for a

20  reason.

21              THE COURT:  I don't understand how you don't have a

22  violation of the law when an agency is mandated to have its

23  employees sign this oath.  And when they don't do that, it

24  violates that constitutional requirement.  Unless I'm missing

25  something, but one and one equals two.  If you don't do what

1   the law says, that's a violation of the law.

2       So if you don't do what the law says, then there's got to

3   be some exemption here.  There's got to be some legal basis for

4   not following the law.

5       Just because the DMV or the Department of Corrections or

6   some other agencies that your client is working for hasn't

7   compelled her to take this oath doesn't mean that what the

8   Office of the State Controller is doing is somehow wrong.  In

9   fact, as much as it may seem strange to your client, in fact,

10  what they're doing is following the law.  And until someone --

11  that someone being the legislature -- tells this state agency

12  otherwise, they're compelled to do that.

13      And your client is asking to, in effect, they're saying --

14  she's saying to the Office of the State Controller, "Oh, you

15  know, look the other way.  It's okay.  You don't have to do

16  this, you know, you don't have to follow the law here."

17      And if I'm the State Controller I'm saying, "Sure, great.

18  What's your authority?"

19      I mean, again, we're going in circles here, but I want to

20  give Ms. Linnett an opportunity to respond to these two issues

21  or anything you want to add.

22          MR. SONNE:  Your Honor, just real briefly.

23          THE COURT:  Go ahead.

24          MR. SONNE:  I want to talk about the other two

25  things.

1            THE COURT:  Yeah, we'll get to those.

2            MR. SONNE:  Okay, thank you.

3            THE COURT:  Yeah.  Go ahead.  Ms. Linnett?

4            MS. LINNETT:  Thank you, your Honor.  And we agree

5    with the Court that there's no conflict, and so this is a kind

6    of -- a manufactured issue that, you know, the perceived

7    conflict doesn't amount to actual conflict, and this is where

8    the circular reasoning comes in.  Because maybe if the oath

9    itself were unconstitutional or there was some problem with the

10   law requiring the oath, then we might get to, you know,

11   there's -- there's some sort of challenge to everybody that

12   this oath is somehow asking them to give up their religious

13   rights.  But it's not, and that's clearly held in the case law

14   that this oath is constitutional and does not infringe on any

15   religious rights.

16       So then we get to what is the effect of a perceived

17   conflict -- or even call it an incidental conflict.  The -- the

18   case that plaintiff cites, the free exercise case, the *Smith*

19   case -- the other *Smith* case, the Supreme Court *Smith* case,

20   that talks about an incidental conflict.  And that's why I say

21   this conflict is, at most, an incidental conflict.  Because

22   she, as alleged, you know, sincerely believes that taking this

23   oath is in conflict with her religious beliefs.  But she's

24   already admitted that she can do the job, she wanted to do the

25   job, and that the doing of the job did not interfere with the

1   practice of her religion, and her religion would not impact it.

2       So she's not asking for an accommodation in terms of any

3   job duties or, you know, employment policy.  This is actually a

4   law that the Office of the State Controller did not create, has

5   no power to change.

6       To the question of preemption.  I mean, as a general

7   matter, the starting place for any kind of preemption analysis

8   is that laws are presumed to co-exist validly, you know, in a

9   valid way, and here Title VII does not preempt the California

10  State Constitution.  And these kinds of loyalty oaths are

11  common in many state governments and in the federal government

12  and often predate the enactment of Title VII.

13      And so, you know, this was -- this is kind of a known

14  concept in the creation of Title VII.  It was not addressed in

15  the drafting of Title VII, and the fact that Title VII does not

16  address loyalty oaths were signals that this is not a concern

17  in general.

18          THE COURT:  What about the argument they've raised, I

19  think you did address it, but just give you a chance to

20  respond.  The argument that other agencies have, at least from

21  her point of view, accommodated, or they haven't required her

22  to take an oath?  What's your reaction to that argument?

23          MS. LINNETT:  Well, much as your Honor has already

24  pointed out, that's not binding authority on this court or on

25  the Office of the State Controller.  And, in fact, the proposed

1    legislation that plaintiffs talked about and we addressed in

2    the briefing actually supports defendants' view that this is

3    not something that can be modified on an ad hoc basis.  It is

4    not what the legislature intended, it is not the intention of

5    the law.  And so -- and, on top of that, state agencies can't

6    just decide for themselves what the law is.  So the Office of

7    the State Controller can't say, "Oh, well, other agencies are

8    doing this," if they even knew about it.  I mean, they look to

9    the courts and to the legislature to tell them what to do, not

10   to what other agencies are doing.

11       But even if they thought, "Well, that makes sense or it's

12   not a big deal," or some other thought goes through their head,

13   they actually cannot, under law, sort of re-interpret or decide

14   that they're not going to follow a state statute or the state

15   constitution until the legislature or the courts tell them

16   otherwise.  That's a decision that's left up to the courts or

17   to the legislature to change the law.

18       So they just simply were without the power to do it.  So,

19   you know, it's kind of -- of no moment whether another agency

20   had another practice or not, and I think it also shows the

21   danger around having an ad hoc approach to modifying the oath.

22       You know, the purpose of this loyalty oath when it was

23   enacted, and as it exists today, is to have a uniform oath that

24   everybody has applied to them the same way as they want to do

25   work in the public sector, and that there's no other oath.

1      And so, in any way, having them, the Office of State

2   Controller, accept the proposed modification would be violating

3   the law two ways because it would be having her do an oath

4   that's not mandated, and it would be sort of injecting this

5   extra loyalty test.  Because they may have to inquire, "Well,

6   is this new modification consistent with the oath that's

7   required, and what does it mean, you know, that your first duty

8   is to God?" if that's how she wants to, you know, affirm that

9   she can take the loyalty oath.  Yes, I can abide by the

10   Constitution, but my first duty is to God and that needs to be

11   in there.

12      Well, then the agency is in a position of having to -- and

13   this goes back to the first *Smith* case -- having to assess

14   that, and that's not the role of a public entity, and it

15   shouldn't be to figure out if there is some sort of inherent

16   conflict between an allegiance to a constitutional form of

17   government and -- on the one hand, and to a primary sense of

18   duty to God on the other hand.  And so --

19          THE COURT:  I also wanted to -- plaintiff raised one

20   other argument saying that, under FEHA, that religious

21   accommodation is absolutely required.  That in effect -- I

22   guess she's arguing that this state law trumps the state

23   constitution.  I want to give you a chance to respond to that

24   as well.

25          MS. LINNETT:  Yeah.  That argument has -- is not

1   valid because the state constitution is the supreme law of the

2   land, so that is the law above FEHA.  And then for the same

3   reasons I was talking about before that, you know, the loyalty

4   oath predates FEHA.  If FEHA was a chance for the legislature

5   to figure out some law, they felt like there was an

6   accommodation needed within the loyalty oath, and that didn't

7   happen.  And, furthermore, FEHA has an explicit exemption for

8   arguably discriminatory practices, that those are permitted

9   under FEHA if otherwise consistent with the law.

10       So FEHA recognizes that there -- you know, that there may

11   be laws that might seemingly be in conflict with FEHA, but that

12   it permits an employer to do those practices if they are

13   following the law.

14       I would also note on the preemption question, that the case

15   that the plaintiff cites, the *Malabed v. North Slope Borough*,

16   this is 335 F.3d 864, that's an illustration of this inquiry

17   into whether Title VII preempts the state constitution.

18            THE COURT:  Right.

19            MS. LINNETT:  And there the Court found that there

20   was no preemption in -- for the Alaska constitutional equal

21   protection clause.  So, I mean, that's sort of case in point of

22   how preemption is very narrow, and even there where they were

23   arguing that Title VII is specifically trying to allow for a

24   preference, preferential treatment for tribal members, the

25   court said, "No, that does not preempt the generally applicable

1   equal protection clause in a state constitution because there's

2   no conflict between the inherent purposes of a state

3   constitution equal protection clause and the Title VII purpose

4   of trying to eliminate employment discrimination."

5        And so Title -- I mean, Section 708 of Title VII is

6   actually a savings clause, it's not a preemption clause.  And

7   the idea is to say -- to preserve the legitimacy of state laws

8   that are not inconsistent with the purpose of Title VII.  And

9   so, similarly here, the state constitution mandating a

10  universal loyalty oath that's allowing for the free exercise of

11  religion is a valid law and consistent with Title VII.

12           THE COURT:  Okay.  Mr. Sonne, anything further you

13  want to add on these first three items?

14           MR. SONNE:  Real briefly.

15           THE COURT:  Go ahead.

16           MR. SONNE:  Surely there was a conflict with the job

17  requirement when the job offer was rescinded because of the

18  conflict between our client's religious beliefs and the

19  insistence of the state of the defendants on an oath without

20  her statement.

21        So the fact that the job was rescinded, it was a

22  requirement to take the oath as is with no statement, so it's a

23  conflict.  In terms of 708, again, we would never allow any

24  other sort of form of discrimination by a state agency without

25  some reference to 708.  708 says that Title VII governs -- or

1   Title VII, excuse me, governs public employment in this

2   context, and it's not required to yield to whatever the state

3   might determine its preferences might be in employment

4   policies.

5       Finally, on the question of what other agencies do, what

6   they otherwise allow, what the *Smith* case says, these are all

7   things that need to be inquired into in the discovery process;

8   these aren't things that can be resolved in the pleadings.

9   *Smith* itself was not resolved in the pleadings, it was resolved

10  on full administrative record.  And we would ask the

11  opportunity to explore these discrepancies.

12      These discrepancies, they may well be innocuous,

13  expository, or whatever words you want to use, but they are

14  ones that -- or they could be -- it could be like *Smith,* it

15  could be different than *Smith*, all these sorts of things.

16  We're making these arguments certainly, but I think they're

17  things that need to be put to the test of.  What is actually

18  going on, what is SCO's position, has it made other exceptions

19  in the past?  We don't know that.  We don't know what its own

20  approach is to that.

21      So these things need to be tested on discovery at a

22  minimum.  And then lastly on the FEHA point.  FEHA doesn't just

23  talk about undue hardship.  FEHA also talks about having

24  explored any other available reasonable alternatives.  So

25  there's a two-part test in FEHA.  So it's not just about

1   hardship, it's also did they explore any available reasonable

2   alternatives.  Well, we know from then Attorney General Brown

3   that one alternative is to make a promise to an employee there

4   at CSU East Bay, I believe it was, that the oath would not be

5   applied against her -- she thought it would require her to take

6   up arms.  So that clarification was made by the Attorney

7   General's Office itself as an accommodation.  So that is an

8   available reasonable alternative means.

9            THE COURT:  Okay.

10           MR. SONNE:  And so that's really important for FEHA

11   consideration as well.

12           THE COURT:  All right.  And then turning to the last

13   two claims of the complaint.  I think, correct me if I'm wrong,

14   but in effect you've conceded the Eleventh Amendment argument

15   raised by the state, and that you know that the claim can't be

16   brought against the Controller's Office itself.  Do you agree?

17   You've conceded that point?

18           MR. SONNE:  Our understanding is that -- against the

19   arm of the state.  I think it's SCO, but not against Defendant

20   Yee or as we offer the individual --

21           THE COURT:  And I don't see these two claims in any

22   way has been argued, raising the issue that the oath itself is

23   not valid.  In fact, I don't think this -- unless I'm reading

24   the complaint incorrectly, I don't see that you're disputing

25   the validity -- or your client is disputing the validity of the

1    oath itself.

2        But my understanding of your theory of these last two

3    claims is that you should be allowed to go forward on these

4    last two claims because it's a violation of your client's

5    constitutional rights for this state not to accept her -- I

6    don't want to call it an addendum -- her modification, her

7    supplementing the oath that she's required to take.  That her

8    free exercise right is violated by the office refusing her

9    modification.

10       That's your theory, right, that the Controller's Office

11   should have accepted her modification?  And refusing to accept

12   her modification they violated her free exercise rights.  Is

13   that a fair summary of your claims?

14            MR. SONNE:  Well, I would put it this way.  Even

15   though the oath has been upheld in other contexts for purposes

16   of, for example, in *Cole* and *Chilton* where there were speech

17   and assembly claims, the question here is whether or not the

18   refusal of the religious accommodation would constitute an

19   independent and free exercise, a violation in terms of -- by

20   refusing to -- by conditioning the job on a violation of our

21   client's religious beliefs and refusing to allow her to have

22   the clarifying statement that that's a violation of her free

23   exercise rights.

24       *Sherbert*, in terms of conditioning a job or access the

25   benefits on the forfeiture, but in that case it was an

1    accommodation situation.

2            THE COURT:  You know that *Sherbert* has been

3    abrogated, right?  You're aware of that?

4            MR. SONNE:  *Sherbert* has not been abrogated on -- in

5    terms of its particulars, which is the conditioning of a job

6    requirement on -- excuse me -- the conditioning of public

7    benefits by forfeiture of religious liberty.

8        So as Justice Scalia pointed out in *Smith*, *Sherbert*

9    involved that situation.  Not the situation in *Smith* which was,

10   as Justice Scalia put it, within the generally applicable

11   law -- criminal law.  That said, the Court specifically

12   distinguished *Sherbert*.  So *Sherbert* is still good law as far

13   as it's concerned.

14       I would also add that *Smith* makes crystal clear that where

15   there are exceptions -- here we have lots of exceptions -- to a

16   rule, that is not -- it's not neutral and generally applicable,

17   and, therefore, we have strict scrutiny.

18       The Court also describes situations where you would have a

19   hybrid rights situation, speech and otherwise.  But,

20   regardless, we know that we have a prima facie case, a

21   substantial burden on religious exercise.  The question is

22   how -- whether the government can justify that burden under any

23   level of scrutiny, and that's a question that cannot be

24   resolved on the pleadings, and, therefore, needs to proceed to

25   see is it really a neutrally generally applicable law, is it

1   one that is conditioning the job benefit like *Sherbert*, are

2   there hybrid rights?  These are all questions that need to be

3   explored in discovery.

4        And I would add, too, in terms of the 1983 arguments, that

5   those arguments were limited to the federal claim, they did not

6   affect the state claim.  And they also, I think, once again,

7   our claim survives those arguments for Defendant Yee, and we

8   can get into the nominal damages piece as well and the other

9   exceptions and the implications for an individual and for our

10  ability to amend -- to make claims for an individual capacity.

11            THE COURT:  Ms. Linnett, is *Sherbert* still good law?

12            MS. LINNETT:  I don't read it as still good law in

13  terms of the issue of whether there's a conflict to begin with.

14  The -- I'm finding hard to wrap my mind around how a

15  constitution -- a law -- a constitutional requirement for an

16  oath that has been upheld as constitutional can also violate

17  the constitution when there's no infringement of freedom of

18  religion, freedom to exercise.

19       There's no allegations that the Office of State Controller

20  was prohibiting the exercise of her religion in any way or the

21  expression of her beliefs.  So I don't know that you get past

22  that.  To me, it is a generally applicable law because it

23  applies -- by its very nature -- it applies to all public

24  employees.

25       So you have the general applicability and the -- because,

1   like in the *Smith* case, the Supreme Court *Smith* case, the 494

2   U.S. 872, you have a law that prohibited -- there a state law

3   that prohibited peyote that was upheld to be constitutional

4   even though the people that were using the peyote believed that

5   it was part of their religion.

6       And then, as a consequence of all of that, they were denied

7   the unemployment benefits.

8           THE COURT:  Right.

9           MS. LINNETT:  And so, similarly here, the chain of

10  events, there's no actual unconstitutional infringement of

11  religion.  The ultimate consequence is that the plaintiff could

12  not work at the Office of State Controller, but it's not

13  directly tied to her exercise of religion.  It just is a law

14  that applies to everybody and is actually meant to protect

15  people from having a separate kind of loyalty test or religious

16  requirement or an employer inquiring into the nature of their

17  religion.

18      So I think, as a matter of law, that this cannot be a

19  violation -- a constitutional violation when it's a

20  constitutional law to begin with.

21          THE COURT:  Okay.  In terms of the mootness argument

22  in the most recent Supreme Court decision, I actually -- I know

23  the students were prepared to argue this -- but I actually

24  agree with the plaintiff's argument that the latest Supreme

25  Court court case -- I'm not going to try to pronounce it --

1    it's spelled U-z-u-e-g-b-u-n-a-m.  It does seem to foreclose at

2    this point a finding of mootness on the facts before the Court

3    taken in the light most favorable to the plaintiff.

4        From a practical matter, it makes little or no sense to the

5    Court to go forward on a case where at most a plaintiff can

6    obtain $1, but, so be it, the Supreme Court didn't seem to be

7    bothered by that, and I'm bound by the Supreme Court holding in

8    that case.  And again, the defendant -- I think the

9    Controller's Office has conceded that nominal damages are

10   theoretically available and might preserve the plaintiff's

11   constitutional claims from being defeated on the mootness

12   grounds.

13       So I don't really need -- sorry to the law students -- but

14   I don't think I need further argument since that point has more

15   or less been conceded.  I wouldn't dismiss this case, those two

16   final claims on mootness grounds.

17       Ms. Linnett, am I incorrectly characterizing your argument

18   on that mootness issue?

19           MS. LINNETT:  No, your Honor.  I mean, I did read the

20   case, and it's obviously very recent.  I'm a little bit unclear

21   of how it procedurally would work in terms of needing to, you

22   know, amend the complaint for the specific nominal damages, and

23   how -- as to how it would be pled exactly.

24       It also seems like the Supreme Court, in the dissent and

25   finding, you know, that defendants to just do this kind of

1    offer of judgment, to settle the case on a dollar, and then we

2    don't get to the merits.

3              THE COURT:  Well, let me raise this question for the

4    plaintiff.  And that is given that she's found another job at

5    this point, is prospective injunctive relief foreclosed in this

6    case as well?  Is this really just a nominal damage case at

7    this point?

8              MR. SONNE:  Well, in terms of the -- in terms of the

9    free exercise claim, we do have an equitable remedy.  The

10   policy hasn't changed as far as we understand from the SCO,

11   and, therefore, it's different than *Uzuegbunam,* where all you

12   had was nominal damages where the policy was, in fact, changed

13   by the defendants.  So we still have our claim for equitable

14   relief against Defendant Yee, and we also, of course, have the

15   nominal damages claim as well.

16             THE COURT:  I'm not following that first argument.

17   What would your claim for equitable relief look like?  What

18   relief would you be seeking?  And I'm looking at your

19   complaint.  You ask that the Court issue a declaratory

20   judgment -- declaratory relief, that the practices complained

21   of are unlawful and violate the U.S. Constitution, the

22   California Constitution, Title VII, and FEHA.

23        That's still valid?

24             MR. SONNE:  Yes, your Honor.

25             THE COURT:  Okay.  And then you also ask that the

1  Court "enjoin the Controller's Office from pursuing its policy

2  of making no religious accommodations to its oath requirement."

3  You think that's still in play?

4              MR. SONNE:  Yes, your Honor.

5              THE COURT:  Okay.

6              MR. SONNE:  And I would add, too, to the dollar

7  point.  Nominal damages in civil rights cases -- and I take

8  your Honor's point about the Court, and that is binding law,

9  and so it's beyond -- you know, we're not really debating here,

10  but I would say that these types of harms in civil rights

11  cases, the religious liberty cases, are very -- are very

12  significant to those involved.  And nominal damages does have a

13  significant salutary effect on the sorts of harms that we're

14  talking about to our client, to others who would be similarly

15  situated, and we can go on.

16              THE COURT:  It also puts into play attorneys' fees as

17  well?

18              MR. SONNE:  Yes, your Honor.

19              THE COURT:  I mean -- look, I've had a lot of cases

20  where -- mainly we do a lot of prisoner cases here -- where the

21  prisoner is only rewarded a dollar.  But if he is represented

22  by counsel, then the attorneys' fees provision comes into play,

23  so that's equally important, right, and I get that.  I

24  understand that.  Okay.

25              MR. SONNE:  And, your Honor -- and then also, your

1    Honor, obviously we have other remedies on the civil rights

2    claims, the employment claims.  And if I could just real

3    quickly --

4              THE COURT:  Go ahead.

5              MR. SONNE:  -- on the general applicable point.  We

6    don't know -- we know that the state does make exceptions, and

7    the argument is we don't even know whether or not this is truly

8    a general law as far the SCO is concerned.  And regardless,

9    whatever level of scrutiny, we have to look it -- and you can't

10   resolve it on the pleadings.  And in terms of *Sherbert*, it was

11   access to employment benefits that had nothing to do with

12   religion.  It was not the injecting of beliefs, but balancing

13   of religious liberty with access to employment benefits.  There

14   was not a criminal statute in play, and essentially the

15   situation that we have here, we have all the various arguments

16   that we've raised in our briefs.

17             THE COURT:  Okay.  All right.  The Court, as I

18   indicated, is prepared to issue a decision this afternoon on

19   the motion to dismiss.  Let me go through the claims and the

20   Court's decision on each of these five claims.

21       In terms of the first three statutory claims, the Title VII

22   religious accommodation claim, the Title VII disparate impact

23   claim, and the FEHA religious accommodation claim.  For each of

24   these three claims there are two general issues that the Court

25   is required to resolve.  First, the Court has to decide whether

1   the plaintiff has plausibly alleged the elements of each claim,

2   and, if so, then the burden shifts to the defendants to show

3   that there are affirmative defenses that may be decided as a

4   matter of law.

5        For both the -- for both religious accommodation claims,

6   the FEHA and Title VII claims, the first and third claims in

7   this complaint, the affirmative defense raised by the defendant

8   is undue hardship.  The undue hardship, the Court recognizes

9   the standard under FEHA is higher than the standard under Title

10  VII.  And for the disparate impact claim, the second cause of

11  action, the affirmative defense that the legal defense raised

12  is business necessity.

13       In terms of this motion to dismiss, the legal issue raised

14  by the defendant and the argument that the defendant has raised

15  is that the undue hardship or business necessity is a legal

16  issue, that the request for an accommodation made by the

17  plaintiff that does require an employer to violate the law is

18  an undue hardship as a matter of law.

19       Plaintiff did argue in the opposition that she believes

20  that she has made a prima facie showing for all these claims.

21  In the reply the defendants -- and argues that the defense

22  didn't challenge that, as I indicated I did not read the briefs

23  that way, and it's clear to the Court the defendants, in fact,

24  do dispute whether the prima facie case has been stated in the

25  particular -- in the reply brief at pages 2 and 3.  The

1    defendant, as I indicated, also has argued that the affirmative

2    defenses raised can, at this stage, be decided as a matter of

3    law because the oath is required by the California

4    Constitution, and plaintiffs' accommodation requests would

5    require them to break that law.

6         In terms of the Title VII claims, again, the first issue is

7    whether the plaintiff has pled that there is an actual conflict

8    with an employment duty, one of the elements of the claim.  An

9    employer can defeat a plaintiff's failure to accommodate claim

10   by proving that accommodating the religious belief at issue

11   would cause undue hardship to its business.

12        The defendants do dispute the actual conflict element and

13   dispute and argue the plaintiff has, in fact, taken effect in

14   the light most favorable to the plaintiff.  The plaintiff has

15   not established an actual conflict between her religious

16   beliefs and her job duties.  Specifically, the defendants have

17   argued that a purported conflict does not rise to the level of

18   an actual conflict just because the plaintiff requested

19   modifying the oath on an ad hoc basis.  In support of this

20   contention, the defendant cites the two cases, *Tiano v. Dillard

21   Department Stores*, the Ninth Circuit case from 1998, and *Smith

22   v. County Engineering*, the Court of Appeals, the case -- the

23   State Court of Appeals case from 1968.

24        The defendants rely on *Tiano* primarily for the proposition

25   that plaintiff needs to show an actual conflict, I don't think

1    that's disputed, and, as a matter of law, that is the required

2    element.

3         Now also, according to the defendants, the plaintiff has

4    not demonstrated or not pled an actual conflict on the

5    undisputed facts, the facts taken in light most favorable to

6    plaintiff in this complaint.

7         The Court does observe initially that the plaintiff's own

8    argument that it, "Strange credulity that a payroll employee

9    would need to take up arms...," that's in the opposition to

10   page 9, "...does cut again for the plaintiff, because if..." as

11   plaintiff states, "...it's highly unlikely that a payroll

12   employee would need to take up arms," then where is the actual

13   conflict between her beliefs and her job duties?

14        The defendants also rely on the California Court of Appeals

15   case, *Smith*, to argue that plaintiff has not shown an actual

16   conflict.  The Court recognizes, as I indicated, that *Smith* is

17   an older case, a case, I think, from 1968, and that the case

18   specifically did not involve either a Title VII or a FEHA

19   claim.

20        And because it didn't specifically concern a Title VII or

21   FEHA claim, it doesn't fit neatly into the analytical framework

22   for either of these types of claims.  In the briefs the parties

23   discuss *Smith* in both the actual conflict discussion and the

24   undue hardship discussions.  In the briefs, the Court will

25   discuss this case with respect to both of those issues as well.

1          *Smith* involved a defendant who worked for the San Diego

2     County engineering department.  He was terminated by the

3     plaintiff -- I'm sorry -- he was terminated.  The plaintiff was

4     a devout Presbyterian, and he refused to sign the state

5     constitutional oath unless he could add an addendum stating, "I

6     take this oath pledging my loyalty and allegiance to my

7     country, but declaring my supreme allegiance to the Lord Jesus

8     Christ whom All Mighty God has appointed ruler of nations and

9     expressing my dissent from the failure of the Constitution to

10    recognize Christ and to acknowledge the divine institution of

11    civil government."

12         The county refused to accept his addendum, he filed a

13    lawsuit, he sought a writ compelling the county to reinstate

14    him after he was terminated.  Then the Court of Appeals in

15    *Smith* found in favor of the County of San Diego and explained

16    that the county "Properly refused to accept the oath encumbered

17    and compromised by plaintiff's injection of an unauthorized

18    potential qualification of its meaning and clarity."

19         The Court also explained that "Nothing in the oath requires

20    a public employee to surrender their religious beliefs.  At the

21    most, the constitutional oath says that the oath taken

22    recognizes the constitutional form of government, and that the

23    oath taker is willing to exert his efforts to continue it as

24    the political system for the government.  Accordingly, the

25    employee's request to change the oath was not addressing an

1    actual conflict but rather "gratuitously injecting his

2    religious beliefs into the governmental process."

3        Furthermore, the Court found that its proposed addendum

4    could not be dismissed as "innocuous or merely expository."

5    The Court of Appeals also noted "it was neither reasonable nor

6    good policy in the case of public employment to put upon civil

7    government the burden of measuring religious beliefs against

8    the interests and requirements of that institution."

9        The plaintiff does discuss and attempt to distinguish

10   *Smith.*  The Court is not persuaded by the arguments raised by

11   the plaintiff in her opposition.  Specifically, the plaintiff

12   points out that the modification requested by *Smith* expressed

13   dissent from the failure of the Constitution to recognize

14   Christ and to acknowledge the divine institution of civil

15   government, whereas the plaintiff in the case before the Court

16   today, Ms. Bolden-Hardge, and her proposed addendum, according

17   to plaintiff, doesn't express such dissent.

18       While this may be so, it does not follow from the absence

19   of that dissenting language that her proposed addendum is

20   necessarily innocuous or merely expository.  And while the case

21   before the Court may be a closer case than *Smith,* because the

22   plaintiff here does not expressly note dissent, the plaintiff's

23   addendum -- her proposed substitute oath or additional oath --

24   nevertheless affirms her "first duty to God," and not the

25   state.

1      And thus, as the defendant did in *Smith*, the State

2  Controller here properly refused to accept the oath incumbered

3  and compromised by plaintiff's injection of an unauthorized

4  potential qualification of its meaning and clarity.  Though

5  plaintiff denies her modification qualifies or disclaims the

6  oath, the Court finds that it does precisely that.

7      This Court also shares the concern of the Court of Appeals

8  in *Smith* that it would not be good policy to put government

9  employers in the position of determining which employee's

10  individual religious accommodation changes were consistent with

11  the oath and which were not.  Yet, forcing public employers to

12  accept an employee's addendum without inquiry might render the

13  uniform oath requirement meaningless.

14      The plaintiff's desired change here to the oath requirement

15  should be pursued, quite frankly, the Court believes, through

16  legislative change and not through ad hoc litigation.

17      For these reasons the Court finds that, like the plaintiff

18  in *Smith*, the plaintiff's proposed addendum appears to be a

19  gratuitous injection of religious belief as opposed to an

20  accommodation required for an actual conflict between her faith

21  and her job duties, the Court finds that plaintiff has not

22  stated a Title VII and religious accommodation claim because

23  she has not shown the first element that an actual conflict

24  between her religious beliefs and her employment duties exist,

25  and accordingly the first claim is dismissed.

1          In terms of the undue hardship affirmative defense, given

2     that the Court finds that the element -- first element hasn't

3     been pled and cannot be pled under the facts of this case, the

4     Court doesn't need to reach the issue of undue hardship, and I

5     will not reach it in this case.  Other than to say that I don't

6     believe there is the support for the plaintiff's argument that,

7     in fact, Section 708 of Title VII trumps the state oath that is

8     involved here.

9          The plaintiff, as I indicated, relies on primarily two EEOC

10    rulings.  These EEOC rulings are not precedential.  The EEOC

11    lacks authority to promulgate substantive rules and regulations

12    that have the force of law.  And after reviewing both of the

13    rulings, neither ruling cites to much, if any, case law, and

14    the Court does not find those EEOC rulings to hold any

15    persuasive value.

16         Plaintiff has also cited to *Malabed v. North Slope Borough*,

17    a Ninth Circuit case from 2003.  In that case the Ninth Circuit

18    found a Title VII clause allowing for Native American

19    employment preferences but did not preempt the equal protection

20    clause of Alaska's Constitution.  Again, cutting against

21    plaintiff's position, the Ninth Circuit emphasized how narrow

22    the expressed preemption provisions in the Civil Rights Act of

23    1967 governing Title VII were and how these provisions severely

24    limit Title VII's preemptive effect.

25         So while plaintiffs are technically correct that *Malabed*

1   notes the possibility of Title VII trumping the state law that

2   required or permitted acts that would be unlawful employment

3   practices under Title VII, the *Malabed* court also emphasized

4   just how narrow that possibility was.

5        In turning to the third claim, the claim brought under FEHA

6   and plaintiff's cause of action that asserts that the

7   Controller's Office violated FEHA by -- or in failure to

8   accommodate her religious beliefs concerning the loyalty oath.

9   As with Title VII, religious accommodation claims, courts apply

10  a burden-shifting analysis to religious accommodation claims

11  under FEHA to establish a prima facie case, the plaintiff needs

12  to show that she has sincere religious belief -- that's not

13  questioned here -- that the employer knew of that belief, and

14  that the belief conflicted with a job requirement.

15       Once the employee can make this showing, the burden then

16  shifts to the employer to show it initiated good faith efforts

17  to accommodate or no accommodation was possible without

18  producing undue hardship.  For the same reason that plaintiff

19  failed to state a Title VII religious accommodation claim, she

20  also, the Court finds, fails here to state a FEHA claim.  She

21  has not shown an actual conflict between her religious belief

22  and the job requirements.

23       As the Court has explained, the plaintiff's proposed

24  addendum, like the one proposed in the Court of Appeals case

25  involving Mr. Smith, appears to be a gratuitous injection of

1   religious belief as opposed to an accommodation required for a

2   conflict between her faith and her job duties.  And if there is

3   no conflict, there is no need for an accommodation, and hence

4   plaintiff has not stated a religious accommodation claim under

5   FEHA either.  The Court would therefore dismiss the third cause

6   of action as well.

7       Again, there's an affirmative defense of undue hardship.

8   The Court need not reach that issue given its finding with

9   respect to the elements not being pled.

10      In terms of the disparate impact Title VII claim, the

11  second cause of action, again, the Court finds for the same

12  reasons that the first and third claims failed, that this claim

13  fails as well.

14      The Court would note that in addition to the reasons that

15  it has dismissed the first and third claims, the second claim

16  also suffers from pleading issues.  The allegations, at least

17  in the Court's opinion, involving disparate impact are

18  conclusory, and the plaintiff obviously needs to complete more

19  than conclusory obligations that this oath requirement has a

20  disparate impact.

21      And plaintiff has not alleged -- at least the Court did not

22  find sufficient facts alleged -- showing that the oath

23  requirement has a significant adverse effect on persons of a

24  protected class.

25      As the Ninth Circuit explained in *Garcia v. Spun Steak*

1    *Company*, "In the disparate impact case, the plaintiffs must do

2    more than merely raise an inference of discrimination before

3    the burden shifts, they must actually prove discriminatory

4    impact.  And in the typical disparate impact case the plaintiff

5    proves discriminatory impact by showing statistical

6    disparities.  Here the plaintiff's allegations, which do not

7    include statistical disparities, nor any other specific facts

8    showing adverse impacts of the protected class, fall short of

9    the high pleading standard for disparate impact claims."

10       Indeed, the authority the plaintiff has cited to confirms

11    as much in the opposition brief at page 10, the plaintiffs

12    cited to *Lee v. Hertz Corporation,* a Northern District of

13    California case from 2019.  In *Lee* the District Court found

14    that the Latino and African-American plaintiffs challenging

15    Hertz's applicant screening process is racially discriminatory,

16    had alleged enough facts to establish a prima facie case of

17    disparate impact and -- to survive defendants' motion to

18    dismiss.

19       Significantly, however, the *Lee* plaintiffs alleged more

20    than what plaintiffs have alleged here, including specific

21    statistical allegations.

22       In that *Lee* case, the Court exclaimed that plaintiffs

23    alleged that Latinos were arrested and convicted of crimes at

24    more than double the rates of whites during the period in

25    question, that any Latino applicant would have been subject to

1   the background check procedure, which included defendants'

2   screening policy and thereby would have been less likely to

3   obtain employment in light of the disproportionate arrest and

4   conviction rates of Latinos.

5       Even under plaintiff's own cited case law, they have not

6   plausibly stated a disparate impact claim under Title VII.  And

7   again, the Court finds that this claim should be dismissed.

8       The last two claims are two constitutional claims against

9   both the Controller's Office and Ms. Yee specifically.  The

10  plaintiff asserts that the defendants violated the free

11  exercise clauses of the United States and California

12  Constitutions.  The plaintiff has conceded that the Eleventh

13  Amendment does bar her Federal Constitution claim against the

14  Controller's Office itself, and that her request for

15  retrospective monetary relief, just for her Section 1983 claim,

16  is barred by the Eleventh Amendment.

17      The Eleventh Amendment does bar section 1983 claims against

18  arms of the state, such as the Office of the State Controller,

19  because state agency are not persons under the statute.  The

20  Eleventh Amendment also limits plaintiff's remedy under Section

21  1983 to prospective relief, thus, plaintiff's free -- federal

22  free exercise claim must be dismissed with prejudice as to the

23  State Controller's Office.

24      The request for a retrospective relief associated with

25  their 1983 claim against Yee in her official capacity must also

1   be dismissed.  The plaintiffs request leave to amend to seek

2   damages from Defendant Yee in her individual capacity.  That

3   request is denied, and I'll explain why.

4        The parties also dispute whether the plaintiff's claim for

5   prospective relief are moot, as the Court indicated it does

6   appear that the plaintiffs are correct that the claims are not

7   moot given the recent Supreme Court case.

8        In terms of dismissal of these claims under 12(b)(6), the

9   plaintiff has alleged that by refusing to allow her to sign the

10  oath with the proposed statement, defendants have proposed a

11  burden on her free exercise of religion in violation of these

12  provisions.

13       In support of her position, the plaintiff cited to *Sherbert*

14  *v. Verner*, a 1963 Supreme Court case, for the argument that

15  "Absent a compelling interest, pursued in a way least

16  restrictive to religious exercise, the state may not force a

17  person to violate their sincerely held religious beliefs in

18  order to secure employment."

19       The Court, in reviewing *Sherbert*, finds that in *Employment*

20  *Division Partner of Human Resources v. Smith*, the 1990 Supreme

21  Court case, that Sherbert was abrogated.  In that case, as we

22  discussed, in the Smith Supreme Court case, the Supreme Court

23  upheld the denial of unemployment benefits to a person who was

24  fired for violating an Oregon law that prohibited the use of

25  peyote, even though the use of peyote was part of a religious

1   ritual.

2       And in *Employment Division v. Smith*, the Supreme Court

3   explained that "neutral laws of general applicability need not

4   be supported by compelling government interests even when the

5   law has the incidental effect of burdening a particularly

6   religious practice."  The test is the same under the California

7   Constitution under *American Family Association v. City and*

8   *County of San Francisco*, the Ninth Circuit case from 2020.

9       In the case before the court today, the state oath

10  requirement is valid.  The plaintiffs do not dispute the

11  validity of the oath itself and of its general applicability.

12  So as a threshold matter, the Court does find that plaintiff

13  cannot and has not stated the First Amendment violation against

14  defendants merely for administering the oath.

15      And perhaps recognizing that there is no legal basis for

16  challenging the administration of the oath itself, the

17  plaintiff has advanced what the Court finds to be an

18  interesting but novel theory.  "That her free exercise right to

19  her violated not by the administering of the oath, but by the

20  Controller's Office refusal of her proposed modification."

21  That is the argument raised in the opposition at page 14.

22      The plaintiff has asked the Court to consider whether the

23  defendants' rejection of Bolden-Hardge's request to include an

24  additional writing about her beliefs cannot constitute a free

25  exercise violation, and requests the chance to prove her

1   request is distinguishable from the cases of *Smith*, *Cole*, and

2   *Shelton*, as well as consistent with the approach of other state

3   agencies and the core free exercise principles.

4       However, because the plaintiff has not brought forward any

5   case law in which another court has recognized this novel

6   theory, the court declines this invitation to engage in what it

7   views as a theoretical exercise, and the Court finds that

8   plaintiff's penalty claims should be dismissed as well.

9       So the Court does grant the defendants' motion to dismiss.

10  The final issue is whether the motion to dismiss should be

11  dismissed with or without prejudice.  The court recognizing

12  that we're at the very, very early stages of this case, but in

13  reviewing the legal issues and the case law and the theory

14  behind this case, the Court does not find that the motion to

15  dismiss raises factual issues or that any further facts could

16  be pled in this case that could save these claims.

17      Again, the claims and the case itself is novel.  There is

18  little if no support in the law for these claims.  The Court

19  fully understands and appreciates the attempts by counsel to

20  vigorously represent Ms. Bolden-Hardge here, and to raise, as I

21  said, legal issues that have not fully been addressed, as far

22  as I can see, by any court.

23      But it's a legal issue case, it's not a factual issue case,

24  and the law at this point does not favor Ms. Bolden-Hardge, and

25  it, in fact, favors what the State Controller -- and the Office

1    of the State Controller did here.  So I don't think that any

2    further amendment would assist in clarifying any issues or

3    possibly pleading to a valid claim being stated that, in

4    effect, further amendment would be futile.  So the Court does

5    dismiss the complaint with prejudice.

6        Okay.  The transcript will stand as the Court's ruling.

7    There will be no further written order in this case, and the

8    Court's comments here today will stand as the order of the

9    case.

10       Thank you all very much.  I appreciate the arguments and

11   the briefing and compliment all of you on what is a very

12   interesting issue.  Okay.  We're going to take a break, and

13   then we'll take up the second case.  Be back in about ten

14   minutes.

15            MR. SONNE:  Thank you, your Honor.  We'd like to

16   order the transcript.

17            THE COURT:  Okay.  We'll let the court reporter know.

18            MS. LINNETT:  And defendants would like a copy as

19   well.

20            THE COURT:  Okay.

21            MS. LINNETT:  Thank you.

22       (Proceedings adjourned:  2:51 p.m.)

23                        ---oOo---

24

25

1    I certify that the foregoing is a correct transcript from the

2    record of proceedings in the above-entitled matter.

3                              /s/ Thresha Spencer
                              THRESHA SPENCER
4                              CSR No. 11788, RPR

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25