1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  KELSEY LINNETT, State Bar No. 274547
   Supervising Deputy Attorney General
3  JOHN T. MCGLOTHLIN, State Bar No. 205844
   Deputy Attorney General
4    1515 Clay Street, 20th Floor
     P.O. Box 70550
5    Oakland, CA  94612-0550
     Telephone:  (510) 879-0295
6    Fax:  (510) 622-2270
     E-mail:  John.McGlothlin@doj.ca.gov
7  *Attorneys for Defendants Office of State Controller,*
   *Malia M. Cohen, Betty T. Yee, and Gerard Anderson*

8                IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13  **BRIANNA BOLDEN-HARDGE,**          2:20-cv-02081-JAM-SCR

14                          Plaintiff,  **NOTICE OF ERRATA REGARDING
                                        DEFENDANTS' OFFICE STATE
15            v.                        CONTROLLER, BETTY YEE, MALIA
                                        COHEN, AND GERARD ANDERSON'S
16                                      OPPOSITION TO PLAINTIFF'S
    **OFFICE OF THE CALIFORNIA STATE    MOTION FOR SUMMARY JUDGMENT,
17  CONTROLLER, et. al.,**              AND CROSS-MOTION FOR SUMMARY
                                        JUDGMENT MOTION**
18                          Defendants.
                                        Date:       August 26, 2025
19                                      Time:       1:00 p.m.
                                        Dept:       6
20                                      Judge:      Hon. John A. Mendez
21

22                                      Trial Date:    3/16/2026
                                        Action Filed:  10/19/2020
23

24

25

26

27

28

                                   1

1         Defendants Office of State Controller, Malia M. Cohen, Betty T. Yee, and Gerard

2    Anderson's ("Defendants") respectfully submit this Notice of Errata in Support of Defendants'

3    Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary

4    Judgment (ECF Nos. 50 and 88), to include the attached document, titled "Rebuttal Expert Report

5    of Vincent Phillip Munoz, Ph.D., with exhibits thereto," which was referred to as Exhibit 3-A in

6    Defendants' Index of Exhibits (ECF No. 93, 2:11-12), and the Declaration of John T. McGlothlin

7    in Support of Defendants' Opposition/Cross-Motion (ECF No. 96, 2:16-18), but which was

8    inadvertently omitted when the Declaration and supporting materials were filed.

9    Dated:  August 27, 2025                    Respectfully submitted,

10                                                ROB BONTA
                                             Attorney General of California

11                                                KELSEY LINNETT
                                           Supervising Deputy Attorney General

12

13

14                                              JOHN T. MCGLOTHLIN

15                                            Deputy Attorney General
                                         *Attorneys for Defendants Office of State*

16                                            *Controller, Malia M. Cohen, Betty T. Yee,*
                                         *and Gerard Anderson*

17   OK2020900414
    91968169.docx

18

19

20

21

22

23

24

25

26

27

28

2

Defs' Ntc. of Errata ISO Oppo. to Pl. Mt. for Summary Judgment and Defs.' Cross-Mt. for Summary
Judgment  (2:20-cv-02081-JAM-SCR)

Exh. 3-A

1  Rob Bonta, State Bar No. 202668
   Attorney General of California
2  Kelsey Linnett, State Bar No. 274547
   Supervising Deputy Attorney General
3  John T. McGlothlin, State Bar No. 205844
   Deputy Attorney General
4  Vincent Cheng, State Bar No. 230827
   Deputy Attorney General
5    1515 Clay Street, 20th Floor
     P.O. Box 70550
6    Oakland, CA  94612-0550
     Telephone:  (510) 879-0986
7    Fax:  (510) 622-2270
     E-mail:  Kelsey.Linnett@doj.ca.gov
8  *Attorneys for Defendants Office of the California*
   *State Controller, Malia M. Cohen, Betty T. Yee, and*
9  *Gerard Anderson*

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12

13

14

| | |
|---|---|
| **BRIANNA BOLDEN-HARDGE,** | 2:20-cv-02081-JAM-SCR |
| Plaintiff, | **REBUTTAL EXPERT REPORT OF VINCENT PHILLIP MUÑOZ, PH.D.** |
| v. | |
| **OFFICE OF THE CALIFORNIA STATE CONTROLLER, et. al.,** | |
| Defendants. | Trial Date:    March 16, 2026<br>Action Filed:  October 19, 2020 |

21

22

23

24

25

26

27  OK2020900414
    USDC Eastern (2 Party) no cover.docx
28

1

1.      **Introduction**

      A.      **Assignment**

      1.      I was retained by the California State Controllers' Office to provide expert analysis and possible testimony concerning the legal history of oaths of office within the framework of United States constitutionalism, the history of California's oath of allegiance requirement, and the original understanding of the First Amendment's Free Exercise Clause. I was asked to review and to respond to the expert declaration of Paul Finkelman, Ph.D.

      B.      **Compensation**

      2.      I will bill the California State Controllers' Office for my work in preparation of this Declaration. My hourly billing rate for the time spent evaluating the issues presented by this case and drafting this Declaration is $500 per hour. My hourly billing rate for any testimony I may provide is $500 per hour.

      3.      My compensation is not contingent upon my findings, the testimony I may give, or the outcome of this case.

      C.      **Qualifications**

      4.      During my nearly thirty-year academic career, I have been a professor of political science and a concurrent professor of law. Currently, I am the Tocqueville Professor of Political Science and Concurrent Professor of Law at the University of Notre Dame. During the Spring 2025 semester, I will be a Distinguished Visiting Fellow at the School of Civic Leadership at The University of Texas at Austin.

      5.      Prior to joining the faculty of the University of Notre Dame in 2009, I held the following faculty appointments: William E. Simon Visiting Fellow in Religion & Public Life, James Madison Program, Princeton University's (2008-09); Faculty Affiliate, Seattle University School of Law (2008); Assistant Professor of Political Science, Tufts University (2005-09); Assistant Professor of Political Science, North Carolina State University (2001-05); Visiting Assistant Professor—Washington, D.C. Program, Claremont McKenna College (2003-04); Lecturer in Politics and Critical Inquiry, Pomona College (1998-2001); Visiting Instructor, California State University, San Bernardino (1996-98).

      6.      My educational degrees include the following: Claremont McKenna College, B.A. (dual majors in Economics and Government, 1993); Boston College, M.A. (Political Science, 1995); Claremont Graduate School, Ph.D. (Political Science, 2001).

7.      I am the author of two single-authored scholarly books: *Religious Liberty & the American Founding: Natural Rights and the Original Meanings of the First Amendment Religion Clauses* (Chicago: University of Chicago Press, 2022); *God and the Founders: Madison, Washington, and Jefferson* (New York: Cambridge University Press, 2009). The latter received the Hubert Morken Award from the American Political Science Association for the best book in religion and politics in 2009-2010.

8.      I am the editor or co-editor of three constitutional law casebooks: *Religious Liberty and The American Supreme Court: The Essential Cases & Documents* (Lanham, MD: Rowman & Littlefield, 2013 (revised edition, 2015); *American Constitutional Law, Vol. I: The Structure of Government*, eds. Rossum, Tarr, and Muñoz, 11th edition (New York: Rutledge, 2020); *American Constitutional Law, Vol. II: The Bill of Rights and Subsequent Amendments*, eds. Rossum, Tarr, and Muñoz, 11th edition (New York: Rutledge, 2020).

9.      I am the author of 26 peer-reviewed journal articles, law review articles, and book chapters, and numerous additional reviews and essays. Journals in which my published scholarship has appeared include: *American Political Science Review*, *American Political Thought*, *The Review of Politics*, *Harvard Journal of Law & Public Policy*, *University of Pennsylvania Journal of Constitutional Law*, *Constitutional Commentary* (forthcoming), *The ANNALS of the American Academy of Political and Social Science* (forthcoming), *Loyola University Chicago Law Journal*, *Notre Dame Law Review*, *Texas Review of Law and Politics*.

10.     Justices of the United States Supreme Court have cited my scholarly publications four times. The citations are as follows: *Fulton v. City of Philadelphia*, 593 U.S. ___ (2021), slip op. at 30 n.34, 50-51, 51 n. 69, 71 n. 81, Justice Alito's concurring opinion, citing "The Original Meaning of the Free Exercise Clause: The Evidence from the First Congress"; *Espinoza v. Montana Department of Revenue*, 591 U.S. ___ (2020), slip op. at 15 n.3, Chief Justice Robert's majority opinion, citing *God and the Founders*; *Espinoza v. Montana Department of Revenue*, 591 U.S. ___ (2020), slip op. at 3, Justice Thomas's concurring opinion, citing "The Original Meaning of the Establishment Clause and the Impossibility of Its Incorporation"; *Town of Greece v. Galloway*, 572 U.S. 565, 606 (2014), Justice Thomas's concurring opinion, citing "The Original Meaning of the Establishment Clause and the Impossibility of Its Incorporation"

11.     I have given more than 100 public and academic lectures at universities and public forums across the United States and in Europe. In 2023 and 2024, I presented lectures at:

2

Acton University, American Enterprise Institute, Arizona State University, Brigham Young University, Bucknell University, Catholic University of America, Claremont McKenna College, Georgetown Law School, Grand Valley State University, Gerard Ford Museum, Harvard University, Intercollegiate Studies Institute, Montreat College, UC Berkeley Law School (twice), University of Nebraska-Omaha, University of Texas at Austin, University of Toledo, University of Virginia, University of Wisconsin (twice), Utah Valley University, Taylor University, Thomistic Institute, Tufts University, United States Military Academy West Point.

12.     A true and correct copy of my curriculum vitae is attached to this Declaration as Exhibit A.

### D.     Materials Considered

13.     I base my interpretations, analyses, and conclusions in this Declaration on my own education, research, writing, and experience as a scholar of political science, law, and American constitutionalism.

14.     It is impossible for me to list every source or even a summary of sources on which I draw my opinions and conclusions pertaining to this case, as I am a scholar who has been working on matters of law, constitutionalism, and religious liberty for over thirty years. I have included citations in this Declaration to relevant primary documents and historical materials where and when appropriate. I have also reviewed the expert declaration of Paul Finkelman, Ph.D.

15.     I understand that discovery with regard to this litigation is ongoing. I reserve the right to supplement or change the opinions of this Declaration if and when additional relevant information is made available to me after the date of this Declaration.

## II.    Summary of Opinions

16.     The case raises questions about the legality of requiring a potential California State employee to take a legally required oath that the potential employee finds religiously objectionable. I have been asked by Defendant to review and respond to the expert declaration of Paul Finkelman, Ph.D. and to offer my professional understanding of the legal history of oaths of office within the framework of United States constitutionalism, the history of California's oath of allegiance requirement, and the original understanding of the First Amendment's Free Exercise Clause.

17.     The following opinions are based on my review, understanding, and interpretation of the relevant evidence, my educational training, and my own scholarly research. All of the opinions stated are my own (and should not be understood to reflect the views of my employers) and are expressed to a reasonable degree of professional certainty. I reserve the right to amend my opinions based on subsequently discovered evidence.

18.     A summary of my opinions is as follows.

19.     Oaths of office are part of the considered history and tradition of American constitutionalism. They further the people's interest in the rule of law and fostering governance according to the law.

20.     The term "defend" in the context of oaths of office has historical roots dating to the Founding era and was employed by Congress in the 19th century in federal legislation to effectuate Article VI's Oath Clause.

21.     The term "defend" in the California constitution loyalty oath does not appear to have been adopted to imply that oath takers are obligated to perform military service or bear arms.

22.     In contrast to the expert declaration of Dr. Paul Finkelman, the term "defend" in the context of oaths of office has not been understood or interpreted to imply miliary service or bearing arms.

23.     Constitutionally required oaths of allegiance were not understood by the First Amendment's authors to violate the freedom of speech, including the freedom not to speak.

24.     The right of religious liberty was understood by the Constitution's authors to be compatible with requiring office holders to swear or affirm an oath.

25.     That the original understanding of the First Amendment right of religious free exercise does not include a constitutional right of exemption from otherwise valid state actions is suggested by the text of the First Amendment.

26.     That the original understanding of the First Amendment right of religious free exercise does not include a constitutional right of exemption from otherwise valid state actions is suggested by the drafting record of the Bill of Rights in the First Congress.

27.     That the original understanding of the First Amendment right of religious free exercise does not include a constitutional right of exemption from otherwise valid state actions is

4

suggested by the Founders' political philosophy of natural rights and social compact constitutionalism.

28.     The First Amendment's Free Exercise Clause was originally designed to impose a categorical limitation on the government's jurisdiction vis-à-vis religious exercises as such. It was not designed to provide religious exemptions from otherwise valid exercises of state power, such as mandatory oaths of office.

III.    **Opinions and Analysis**

   A.    **Oaths of Office are Part of the Considered History and Tradition of American Constitutionalism. They Further the People's Compelling Interest in the Rule of Law and Fostering Governance According to the Law.**

29.     The expert declaration of Dr. Paul Finkelman fails to adequately state the purposes of oaths of office in a constitutional republic. The principles of American constitutionalism hold that political authority originally belongs to "we the people" and that political authority is delegated by the people to those who govern through a system of fundamental laws known as a constitution (or in the case of a federal republic such as America, though both federal and state constitutions). The people require office holders to take an oath of allegiance to their constitutions to foster among office holders certain virtues, including: constitutional fidelity, impartiality, conscientiousness, and uniformity in the discharge of the duties entrusted to those who hold office.

30.     The requirement to take a solemn oath communicates the people's expectation that office holders will serve the public good, follow the rule of law, and faithfully execute the duties and responsibilities of their office according to the law. Oaths of office also are a traditional manner of forming the character of office holders. The people require office holders to take an oath upon assuming governmental power to help ensure that office holders govern according to the fundamental laws that the people themselves have authorized. An office holder taking an oath specified by the people communicates to the people that that the office holder will exercise and execute the powers of his or her office in a manner that is faithful to and in support of the constitutional and legal system established by the people to protect and safeguard the people's rights and interests.

31.     Oaths of office in a constitutional republic, in short, are designed to foster the rule of law and encourage confidence among the people that those who exercise governmental authority will govern according to the law.

32.     The expert declaration of Dr. Paul Finkelman fails to consider and account for important aspects of oaths in the American constitutional tradition. The American constitutional tradition of office holders taking oaths of allegiance dates to Founding-era state constitutions and the 1787 Federal Constitution. Of the fifteen states that drafted constitutions by 1803,[1] thirteen mandated oaths for office holders in their state constitutions.[2] Pennsylvania's 1776 Constitution (Sect. 10), for example, provides that members of the house of representatives take the following "oath or affirmation of fidelity and allegiance":

> I do swear (or affirm) that as a member of this assembly, I will not propose or assent to any bill, vote, or resolution, which shall appear to me injurious to the people; nor do or consent to any act or thing whatever, that shall have a tendency to lessen or abridge their rights and privileges, as declared in the constitution of this state; but will in all things conduct myself as a faithful, honest representative and guardian of the people, according to the best of my judgment and abilities.[3]

New Hampshire's 1784 Constitution, similarly, provides:

> ANY person chosen president, counsellor, senator, or representative, military or civil officer (town officers excepted,) accepting the trust, shall, before he proceeds to execute the duties of his office, make and subscribe the following declaration, viz.
>
> I, A. B. do truly and sincerely acknowledge, profess, testify and declare, that the state of New-Hampshire is, and of right ought to be, a free, sovereign and independent state; and do swear that I will bear faith and true allegiance to the same, and that I will endeavor to defend it against all treacherous conspiracies and hostile attempts whatever; and I do further testify and declare, that no man or body of men, hath or can have, a right to absolve me from the obligation of this oath, declaration or affirmation; and that I do make this acknowledgement, profession, testimony, and declaration, honestly and truly, according to the common acceptation of the

---

[1] There were 17 states in the Union in 1803, but Rhode Island and Connecticut had not adopted state constitutions by 1803.

[2] Delaware (1776, Art. 22); Georgia (1777, Art. XIV); Kentucky (1792, Art. VII); Maryland (1776, Art. LV); Massachusetts (1780, Chapter VI); New Hampshire (1784); New Jersey (1776, Art. XXIII); North Carolina (1776, Art. XII); Ohio (1802, Art. VII); Pennsylvania (1776, Sect. 10); South Carolina (1778, Art. XXXVI); Tennessee (1796, Art. IX); Vermont (1786, Section IX).  These oaths of allegiance are distinct from the religious tests for office mandated by some Founding-era state constitutions and provided for in separate required oaths.

Virginia's 1776 Constitution did not include or mandate an oath of office for office holders. New York's 1777 Constitution (Art. VIII) provided, "That every elector, before he is admitted to vote, shall, if required by the returning-officer or either of the inspectors, take an oath, or, if of the people called Quakers, an affirmation, of allegiance to the State," but it did not mandate an oath for office holders.

[3] Constitution of Pennsylvania—1776, Sect. 10, in *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America*, ed. Francis Newton Thorpe, 7 vols., (Washington: Government Printing Office, 1909), V: 3085.

foregoing words, without any equivocation, mental evasion or secret reservation whatever.

So help me GOD.[4]

33.     Article II of the United States Constitution of 1787 provides a specific oath of office for the President of the United States.[5] Additionally, Article VI of the United States Constitution provides:

> The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

34.     The genesis of Article VI's Oath Clause was James Madison's proposal in the 1787 Constitutional Convention in Philadelphia that "the Legislative Executive & Judiciary powers within the several States ought to be bound by oath to support the articles of Union."[6] Alexander Hamilton explains as Publius in *Federalist* 27 that the Constitution's framers sought to foster among state office holders allegiance to and compliance with the Federal Constitution.[7] James Madison in *Federalist* 44 further emphasizes that it is particularly important that state officers take an oath to support the Federal Constitution because "[t]he members and officers of the State governments, … will have an essential agency in giving effect to the federal Constitution."[8]

35.     Article VI requires members of the state legislatures and state executive and judicial officers to "be bound by Oath or Affirmation, to support this Constitution;…" Article VI, however, does not provide the text of the oath that the aforementioned officers are to take. Federal legislation to give effect to the Oath Clause, accordingly, has been adopted.

---

[4] Constitutions of New Hampshire—1784, Part II.-The Form of Government, Oaths & Subscriptions…, in Thorpe, *The Federal and State Constitutions*, IV: 2468.

[5] United States Constitution, Article II, Section 1: "I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States."

[6] Resolutions submitted to the Constitutional Convention on May 29, 1787 (#14), (available at https://www.senate.gov/civics/common/generic/Virginia_Plan_item.htm, accessed Nov. 21, 2024).

[7] Publius (Alexander Hamilton), *The Federalist Papers*, ed. Clinton Rossiter (New York: Mentor, 1999), 145.

[8] Publius (James Madison), *The Federalist Papers*, 255.

36.    The very first law passed by the First Congress, "An Act to regulate the Time and Manner of administering certain Oaths," provided the following oath to fulfill the constitutional obligation imposed by Article VI:

> I do solemnly swear (or affirm) that I will support the Constitution of the United States.[9]

During and immediately after the Civil War, this oath was altered in 1862[10] and 1868.[11] Dr. Finkelman's report fails to note that the text of the oath currently in use was adopted by Congress on May 13, 1884, and is as follows:

> I, A.B., do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God.[12]

37.    Regarding the purpose of the Article VI Oath Clause, Joseph Story writes in his *Commentaries of the Constitution of the United States*,

> That all those, who are entrusted with the execution of the powers of the national government, should be bound by some solemn obligation to the due execution of the trusts reposed in them, and to support the constitution, would seem to be a proposition too clear to render any reasoning necessary in support of it. It results from the plain right of society to require some guaranty from every officer, that he will be conscientious in the discharge of his duty. Oaths have a solemn obligation upon the minds of all reflecting men, and especially upon those, who feel a deep sense of accountability to a Supreme being. If, in the ordinary administration of justice in cases of private rights, or personal claims, oaths are required of those, who try, as well as of those, who give testimony, to guard against malice, falsehood, and evasion, surely like guards ought to be interposed in the administration of high public trusts, and especially in such, as may concern the welfare and safety of the whole community.[13]

---

[9] 1 Stat. 23 (June 1, 1789). See David P. Currie, *The Constitution in Congress: The Federalist Period, 1789-1801* (Chicago: University of Chicago Press, 1997), 13-15.

[10] Chap. CXXVIII, 12 Stat. 502 (July 2, 1862).

[11] Chap. CXXXIX, 15 Stat. 85 (July 11, 1868).

[12] Chap. 46, 23 Stat. 21, 22 (May 13, 1884); U.S. Code, Title 5, Sec. 3331: Oath of Office.

[13] Joseph Story, *Commentaries on the Constitution of the United States*, (Boston: C.C. Little and J. Brown, 1851), 2:576 (§1844).

It is proper that officers of the federal and state governments are equally bound to take a like oath, Story continues, because

> [t]he members and officers of the state governments have an essential agency in giving effect to the national constitution…. The executive authority of the several states may be often called upon to exert powers, or allow rights, given by the constitution …. Decisions ought to be, as far as possible, uniform; and uniformity of obligation will greatly tend to such a result. …[14]

38.     Story suggests at least four reasons for officer holders, including state officials, to take an oath of loyalty to the Constitution: (1) all those entrusted with execution of constitutional powers should be bound by a solemn obligation; (2) the taking of an oath helps to shape and form the moral character of the oath taker—in Story's words, "[o]aths have a solemn obligation upon the minds of all reflecting men"; (3) the taking of oaths by office holders provides a degree of confidence among the people that those entrusted with governmental power will execute the powers of their office impartially and in accordance with the rule of law; and (4) the uniformity of the oath and the obligations it imposes will contribute to the uniformity of decisions by those who hold office.

39.     Story concludes about the obligation of state officers to take an oath to support the Constitution:

> These, and many other functions, devolving on the state authorities, render it highly important, that they should be under a solemn obligation to obey the constitution. In common sense, there can be no well-founded objection to it. There may be serious evils growing out of an opposite course.[15]

**B.     The Term "Defend" in the Context of Oaths of Office Has Historical Roots Dating to the Founding Era and was employed by Congress in the 19th Century to effectuate Article VI's Oath Clause.**

40.     While the oath legislated by the First Congress did not include the word "defend," the use of the term "defend" in loyalty oaths dates to the Founding period. Dr. Finkelman's report misstates the number of times "defend" appears in Founding-era oaths of office, and it does not provide historical details about the use of "defend" in oaths as early as the 19th century.

---

[14] Story, *Commentaries*, 2:577 (§1845).

[15] Story, *Commentaries*, 2:577 (§1845). To support this point, Story himself cites Madison's comment in *Federalist* 44 that state officials must take a federal oath because they "will have an essential agency in giving effect to the Federal Constitution."

41.     Of the fifteen states that drafted state constitutions between 1776 and 1803, thirteen require and provide loyalty oaths in their respective state constitutions.[16] Of these thirteen states, three state oaths of office employ the term "defend" (not two states, as claimed by Dr. Finkelman's report, ¶60). The 1778 South Carolina Constitution provides:

> XXXVI. That all persons who shall be chosen and appointed to any office or to any place of trust, civil or military, before entering upon the execution of office, shall take the following oath: "I, A. B., do acknowledge the State of South Carolina to be as free, sovereign, and independent State, and that the people thereof owe no allegiance or obedience to George the Third, King of Great Britain, and I do renounce, refuse, and abjure any allegiance or obedience to him. And I do swear [or affirm, as the case may be] that I will, to the utmost of my power, support, maintain, and **defend** the said State against the said King George the Third, and his heirs and successors, and his or their abettors, assistants, and adherents, and will serve the said State, in the office of ____, with fidelity and honor, and according to the best of my skill and understanding: So help me God."[17]

Chapter VI, Article I of the Massachusetts Constitution of 1780 provides:

> Any person chosen Governor, Lieutenant-Governor, Counsellor, Senator, or Representative, and accepting the trust, shall, before he proceed to execute the duties of his place or office, make and subscribe the following declaration, …
>
> "I, A. B., do truly and sincerely acknowledge, profess, testify and declare, that the Commonwealth of Massachusetts is, and of right ought to be, a free, sovereign and independent State; and I do swear, that I will bear true faith and allegiance to the said Commonwealth, and that I will **defend** the same against traitorous conspiracies and all hostile attempts whatsoever; And that I do renounce and adjure all allegiance, subjection and obedience to the King, Queen or Government of Great Britain (as the case may be), and every other foreign power whatsoever: And that no foreign Prince, Person, Prelate, State or Potentate, hath, or ought to have, any jurisdiction, superiority, preeminence, authority, dispensing or other power, in any matter, civil, ecclesiastical or spiritual, within this Commonwealth, except the authority and power which is or may be vested by their Constituents in the Congress

---

[16] Loyalty oaths are different from and should not be confused with state religious tests for office, which in some Founding-era states were also prescribed by and in state constitutions. The thirteen Founding-era states (defined as between 1776-1803) that included loyalty oaths for officers in the respective constitutions are: (Delaware (1776), Georgia (1777), Kentucky (1792), Maryland (1776), Massachusetts (1780), New Hampshire (1784), New Jersey (1776), North Carolina (1776), Ohio (1802), Pennsylvania (1776), South Carolina (1778), Tennessee (1796), Vermont (1786), Virginia (1776).

The Constitution of New York (1777) required oaths of electors before they voted. It provided:

> VIII. That every elector, before he is admitted to vote, shall, if required by the returning-officer or either of the inspectors, take an oath, or, if of the people called Quakers, an affirmation, of allegiance to the State.

The Constitution of Virginia (1776), appears not to have required office holders to take an oath.

[17] Emphasis added. Constitution of South Carolina—1778, in Thorpe, *Federal and State Constitutions*, VI: 3255.

of the United States; And I do further testify and declare, that no man or body of men hath or can have any right to absolve or discharge me from the obligation of this oath, declaration or affirmation; and that I do make this acknowledgment, profession, testimony, declaration, denial, renunciation and abjuration, heartily and truly, according to the common meaning and acceptation of the foregoing words, without any equivocation, mental evasion, or secret reservation whatsoever. So help me GOD."

"I, A. B., do solemnly swear and affirm, that I will faithfully and impartially discharge and perform all the duties incumbent on me as ____; according to the best of my abilities and understanding, agreeably to the rules and regulations of the Constitution, and the laws of this Commonwealth. So help me GOD."[18]

The New Hampshire Constitution of 1784—which seems to have not been considered in Dr. Finkelman's repot—provides for any "person chosen president, counsellor, senator, or representative, military or civil officer (town officers excepted), accepting the trust, shall, before he proceeds to execute the duties of his office, make and subscribe the following declaration, viz.":

I, A. B., do truly and sincerely acknowledge, profess, testify and declare, that the state of New-Hampshire is, and of right ought to be, a free, sovereign and independent state; and do swear that I will bear faith and true allegiance to the same, and that I will endeavor to **defend** it against all treacherous conspiracies and hostile attempts whatever: and I do further testify and declare, that no man or body of men, hath or can have, a right to absolve me from the obligation of this oath, declaration or affirmation; and that I do make this acknowledgement, profession, testimony, and declaration, honestly and truly, according to the common acceptation of the foregoing words, without any equivocation, mental evasion or secret reservation whatever.

So help me GOD.

I, A. B., do solemnly and sincerely swear and affirm, that I will faithfully and impartially discharge and perform all the duties incumbent on me as according to the best of my abilities, agreeably to the rules and regulations of this constitution, and the laws of the state of New-Hampshire.

So help me GOD.[19]

42.    The Oath of Office required of the President of the United States specified in Article II, Section 1 of the United States Constitution of 1787 also uses the term "defend":

---

[18] Massachusetts Constitutions or Form of Government for the Commonwealth of Massachusetts—1780, in Thorpe, *Federal and State Constitutions*, III: 1908-09.

[19] Constitutions of New Hampshire—1784, Part II.-The Form of Government, Oaths & Subscriptions…, in Thorpe, *The Federal and State Constitutions*, IV: 2468.

I do solemnly swear (or affirm) that I will faithfully execute the office of the President of the United States, and will to the best of my ability, preserve, protect and **defend** the Constitution of the United States.[20]

43.     As already discussed, the word "defend" in the loyalty oath prescribed by federal law was introduced by Congress in the 1860s. The current loyalty oath prescribed by federal law was adopted by Congress on May 13, 1884 and is as follows:

I, A.B., do solemnly swear (or affirm) that I will support and **defend** the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God.[21]

44.     Contrary to the suggestion in Dr. Finkelman's report (see ¶62-63), Founding-era oaths that employed the term "defend" were not limited to executive branch officials whose duties specifically related to military matters or bearing arms. Founding-era state oaths required included the term "defend" for oath takers in the legislative branches of government. South Carolina's 1778 Constitution provided "That all persons who shall be chosen and appointed to any office or to any place of trust, civil or military, before entering upon the execution of office" take an oath that included the term "defend."[22] Massachusetts's 1780 Constitution provided that, "Any person chosen Governor, Lieutenant-Governor, Counsellor, Senator, or Representative" take an oath that included the term "defend."[23] New Hampshire's 1784 Constitution requires any person "chosen president, counsellor, senator, or representative, military or civil officer (town officers excepted)" to take an oath that included the term "defend."[24]

## C.     The Term "Defend" in the California Constitution Loyalty Oath Does Not Appear to Have Been Adopted to Imply that Oath Takers Are Obligated to Perform Military Service or Bear Arms.

---

[20] Emphasis added.

[21] Emphasis added. Chap. 46, 23 Stat. 21, 22 (May 13, 1884); U.S. Code, Title 5, Sec. 3331: Oath of Office.

[22] Constitution of South Carolina—1778, in Thorpe, *Federal and State Constitutions*, VI: 3255.

[23] Massachusetts Constitutions or Form of Government for the Commonwealth of Massachusetts—1780, in Thorpe, *Federal and State Constitutions*, III: 1908-09.

[24] Constitutions of New Hampshire—1784, Part II.-The Form of Government, Oaths & Subscriptions…, in Thorpe, *The Federal and State Constitutions*, IV: 2468.

45.     The California Constitution provides, in relevant part, that covered government employees must swear to the following loyalty oath:

> I, _____, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution of the State of California against all enemies, foreign and domestic; that I will bear true faith and allegiance to the Constitution of the United States and the Constitution of the State of California; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties upon which I am about to enter.[25]

California's currently loyalty oath dates to the adoption of Amendment No. 9 in 1952.

46.     Prior to 1952, California's constitutionally prescribed loyalty oath was:

> I do solemnly swear (or affirm, as the case may be), that I will support the Constitution of the United States and the Constitution of the State of California, and that I will faithfully discharge the duties of the office of _____, according to the best of my ability.

47.     Contrary to Dr. Finkelman's report (see, e.g., ¶83), the term "defend" in the California Constitution loyalty oath does not appear to have been adopted to imply that oath takers are obligated to perform miliary service or bear arms. California's current loyalty oath, which includes the term "defend," was adopted through a 1952 ballot proposition (Proposition 6), with the support of nearly 70% of California voters.[26] Prior to the 1952 general election, California's Secretary of State, Frank M. Jordan, prepared and distributed to California voters an official voter information guide that included the texts of the proposed amendments to the California Constitution as well as statements for and against each ballot proposition.[27] Neither the statement for Proposition 6, authored by Assemblyman Harold K. Levering, nor the statement against Proposition 6, authored by Assemblymen George Collins and Edward Elliott, referenced the word "defend" or suggested that "defend" was included in the then-proposed constitutional oath to require or suggest that oath takers would be under the obligation to serve in the military or bear arms.

---

[25] California Constitution, Article XX, Sec. 3.

[26] According to the website Ballotpedia, Proposition 6 (1952) passed with 2,951,995 "yes" votes (69.58%) and 1,290,851 "no" votes (30.42%). https://ballotpedia.org/California_Proposition_6,_Oath_of_Office_of_Public_Officers_and_Employees_Amendment_(1952) (accessed on November 18, 2024).

[27] Voter Information Guide for 1952, General Election (1952). http://repository.uchastings.edu/ca_ballot_props/544 (accessed on November 18, 2024).

48.     Dr. Finkelman's report fails to note that the relevant part of the 1952 California oath adopted through Proposition 6 exactly matches the then-existing (and still current) federal oath adopted by Congress in 1884, with two modifications—(1) the 1952 California oath requires the oath taker to swear or affirm allegiance to the Constitution of the United States and the Constitution of the State of California, whereas the federal oath (as one would expect) only requires the oath taker to swear or affirm allegiance to the former; (2) the 1952 California oath omits the phrase "So help me God" at the end of the oath.

**D.     The Term "Defend" in the Context of Oaths of Office Has Not Been Understood or Interpreted to Imply Miliary Service or Bearing Arms.**

49.     The United States Supreme Court has construed the word "defend" in at least two cases, *Girouard v. United States*, 328 U.S. 61 (1946) and *Cole v. Richardson*, 405 U.S. 676 (1972). The expert declaration of Dr. Paul Finkelman does not include a discussion of these cases, an omission I believe to be relevant to the consideration of the meaning of "defend" in the context of constitutional oaths. In both cases, the Court construed an oath requiring the oath taker to "defend" the Constitution as not requiring the oath taker to bear arms.

50.     In *Girouard v. United States*, 328 U.S. 61 (1946), the Court construed the oath of allegiance required of aliens before they are admitted to United States citizenship. The oath (54 Stat. 1157, 8 U. S. C. § 735 (b)) reads as follows:

> I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which I have heretofore been a subject or citizen; that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I take this obligation freely without any mental reservation or purpose of evasion: So help me God.

51.     According to Justice Douglas's opinion for the Court, the oath—including the words, "I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic"—does not require the oath taker to bear arms. Writing for the Court, Justice Douglas stated:

> The oath required of aliens does not in terms require that they promise to bear arms. Nor has Congress expressly made any such finding a prerequisite to citizenship. To hold that it is required is to read it into the Act by implication. But we could not assume that Congress intended to make such an abrupt and radical departure from our traditions unless it spoke in unequivocal terms.

>    The bearing of arms, important as it is, is not the only way in which our institutions may be supported and defended, even in times of great peril.[28]

52.    In *Cole v. Richardson*, 405 U.S. 676 (1972), the Supreme Court construed the following Massachusetts oath of allegiance, required of all Massachusetts state employees:

>    I do solemnly swear (or affirm) that I will uphold and defend the Constitution of the United States of America and the Constitution of the Commonwealth of Massachusetts and that I will oppose the overthrow of the government of the United States of America or of this Commonwealth by force, violence, or by any illegal or unconstitutional method.

The Supreme Court recognized that its prior decisions prohibited the federal and state governments from conditioning employment on taking oaths that impinge on rights guaranteed by the First and Fourteenth Amendment, including oaths that are "so vague that 'men of common intelligence must necessarily guess as its meaning and differ as to its application, …"[29] Nonetheless, it held that the District Court had incorrectly "applied a highly literalistic approach to the second clause ['that I will oppose the overthrow of the government of the United States of America or of this Commonwealth by force, violence, or by any illegal or unconstitutional method'] to strike it down."[30] In his opinion for the Court, Chief Justice Burger explained,

>    such a literal approach to the second clause is inconsistent with the Court's approach to the "support" oaths. One could make a literal argument that "support" involves nebulous, undefined responsibilities for action in some hypothetical situations. As Mr. Justice Harlan noted in his opinion concurring in the result on our earlier consideration of this case,
>
>>    "[A]lmost any word or phrase may be rendered vague and ambiguous by dissection with a semantic scalpel. . . . [But such an approach] amounts to little more than verbal calisthenics. Cf. S. Chase, The Tyranny of Words (1959); W. Empson, Seven Types of Ambiguity (1955)." *Cole v. Richardson*, 397 U. S. 238, 240 (1970).
>
>    We have rejected such rigidly literal notions and recognized that the purpose leading legislatures to enact such oaths, just as the purpose leading the Framers of our Constitution to include the two explicit constitutional oaths, was not to create specific responsibilities but to assure that those in positions of public trust were

---

[28] *Girouard v. United States*, 328 U.S. 6, 64 (1946).

[29] *Cole v. Richardson*, 405 U.S. 676, 680-81 (1972) (quoting *Cramps v. Board of Public Instruction*, 368 U.S 278. 287 (1961)).

[30] *Cole v. Richardson*, 405 U.S. 676, 683.

willing to commit themselves to live by the constitutional processes of our system,…[31]

Chief Justice Burger continued,

The purpose of the oath is clear on its face. We cannot presume that the Massachusetts Legislature intended by its use of such general terms as "uphold," "defend," and "oppose" to impose obligations of specific, positive action on oath takers.[32]

### E. Constitutionally Required Oaths of Allegiance Were Not Understood by the First Amendment's Authors to Violate the Freedom of Speech, Including the Freedom Not to Speak.

53.     That constitutionally mandated oaths of allegiance were understood to be constitutionally compatible with the First Amendment's protection of freedom of speech is evinced by the fact that the same Congress that drafted the First Amendment also enacted legislation composing the original oath of allegiance to be taken by federal and state officials.

54.     As noted above, the First Congress enacted a law prescribing the text, time, and manner of taking the oath required by Article VI of the Federal Constitution. As noted, this was the very first law passed in the very first session of Congress. The same Congress drafted what would become the Bill of Rights, including the First Amendment's protection of freedom of speech. Unless we presume that the very drafters of the First Amendment enacted legislation that violated the First Amendment, requiring office holders to take an oath cannot be presumed to trespass the original understanding of the protected First Amendment right of freedom of speech.

55.     In *West Virginia v. Barnette* (1943), the Supreme Court recognized that schoolchildren have a constitutional right not to salute the flag and cannot be compelled to recite the Pledge of Allegiance. The facts of *Barnette*, however, preclude its ruling from being extended to cover office holders who are constitutionally required to take an oath of office. I disagree with the conclusions Dr. Finkelman draws from *Barnette* (¶103) as they apply to oaths of office.

56.     Unlike state office holders who not compelled by law to work for the government, the West Virginia schoolchildren involved in *West Virginia v. Barnette* were legally required to attend school. Failure to comply with the mandatory flag salute and recitation of the Pledge of Allegiance was considered "insubordination" and punished by expulsion of the insubordinate

---

[31] *Cole v. Richardson*, 405 U.S. 676, 683-84 (1972).

[32] *Cole v. Richardson*, 405 U.S. 676, 684 (1972).

child from school. Expelled children were deemed "unlawfully absent" from school, and the child's parent or guardian were then liable to prosecution and, if convicted, subject to a fine not exceeding $50 and a jail term not exceeding thirty days for failure to comply with the state's mandatory school attendance laws.[33] The First Amendment freedom recognized in *West Virginia v. Barnette* is not a generalized freedom against all forms of state-required speech; rather, *Barnette* recognizes the freedom of schoolchildren and their parents, when subject to mandatory and coercive school attendance regulations, not to be subject to punishment (including criminal penalties) on account of not reciting the Pledge of Allegiance or saluting the American flag.

57.     An individual seeking employment from the state of California is not in a similar situation to the schoolchildren and parents in *West Virginia v. Barnette*. The employment-seeking individual is not compelled by law to work for the state and is not subject to punishment if he or she does not work for the state. The children and parents in *West Virginia v. Barnette* either had to salute the flag and recite the Pledge of Allegiance or be subject to disciplinary sanctions. An individual seeking government employment from the state of California can either accept the employment offer and take the required oath or reject the employment offer (or not seek an employment offer) from the state. An individual seeking employment from the state of California is not compelled to speak in a manner analogous to the school children in *West Virginia v. Barnette*.

**F.      The Right of Religious Liberty was Understood by the Constitution's Authors to be Compatible with Requiring Office Holders to Swear or Affirm an Oath.**

58.     Article VI of the Federal Constitution makes clear that the Constitution's drafters and ratifiers held that requiring office holders to swear or affirm an oath of allegiance is compatible with religious freedom. The same sentence in Article VI requires office holders (state and federal) to be bound by oath or affirmation to support the Constitution, and, at the same time, it protects religious freedom by banning religious tests for office and it accommodates religious interests by allowing the swearing or affirmation of the prescribed oath.

59.     Article VI provides:

The Senators and Representatives before mentioned, and the members of the several state legislatures, and all executive and judicial officers, both of the United

---

[33] The facts of the case and the West Virginia laws involved are spelled out in *West Virginia v. Barnette*, 319 U.S. 624, 628-29 (1943).

> States and of the several states, shall be bound by oath or affirmation, to support this Constitution; but no religious test shall ever be required as a qualification to any office or public trust under the United States.

Dr. Finkelman's report does not comprehend (see ¶52-53, 58) how Article VI's Oath Clause and its No Religious Test Clause achieve a precise and considered constitutional balance of recognition of religious liberty rights, accommodation of religious interests, and the securing of state interests. Religious liberty rights are protected by prohibiting religious tests for office. The religious interests of non-majority religious adherents are accommodated by letting office holders be bound "by oath or affirmation." State interests are secured by requiring federal and state officers to support the Constitution by an oath. Article VI itself is cognizant of the rights of religious liberty and the need for accommodation of religious minorities.

60.     The framers and drafters of the Constitution clearly thought that a constitutionally required oath—if one could swear or affirm it—was compatible with religious liberty. Joseph Story, in his *Commentaries on the Constitution*, points to the Constitution's provision that office holders can be bound "by oath or affirmation" as securing religious liberty:

> But there are known denominations of men, who are conscientiously scrupulous of taking oaths (among which is that pure and distinguished sect of Christians, commonly called Friends, or Quakers) and therefore, to prevent any unjustifiable exclusion from office, the constitution has permitted a solemn affirmation to be made instead of an oath, and as its equivalent.[34]

**G.     That the Original Understanding of the First Amendment Right of Religious Free Exercise Does Not Include a Constitutional Right of Exemption from Otherwise Valid State Actions Is Suggested by the Text of the First Amendment.**

61.     The declaration of Dr. Finkelman does not comprehend the meaning of the principle of religious "free exercise" (see, e.g. ¶74, ¶82) as it was originally understood. The First Amendment, in relevant part, provides, "Congress shall make no law … prohibiting the free exercise [of religion]." In *Cantwell v. Connecticut* (1940), the Supreme Court found the protections of the Free Exercise Clause also apply against state governments. The term "free exercise," to the best of my knowledge, was not a term of art and did not have a commonly

---

[34] Story, *Commentaries*, 2:576 (§1844).

accepted or precise meaning at the time of its adoption. "Free exercise" appears to have referred to a more general principle of religious liberty.[35]

62.    Whatever the scope of the Free Exercise Clause's protections, the text of the First Amendment provides that Congress (and with incorporation, the states) can pass no law prohibiting it. The First Amendment's protection of religious liberty, in other words, is categorical. Unlike the Fourth Amendment's protection against "unreasonable" searches and seizures or the Fifth Amendment's protections against deprivations of life, liberty, and property "without due process of law," the text of the First Amendment appears to offer no constitutional space for "reasonable" prohibitions of religious free exercise if "due process" is afforded. The text of the First Amendment—"Congress shall make no law … prohibiting the free exercise [of religion]"—would seem to preclude any textual construction that provides that the constitutionally protected right of religious free exercise may be prohibited by the federal or state governments if and when a compelling state interest is pursued in a narrowly tailored manner.

**H.    That the Original Understanding of the First Amendment Right of Religious Free Exercise Does Not Include a Constitutional Right of Exemption from Otherwise Valid State Actions is Suggested by the Drafting Record of the Bill of Rights in the First Congress.**

63.    The drafting records in the First Congress, to the best of my understanding, also do not yield a clear original meaning of what constitutes the "free exercise" of religion. The drafting records of what would become the Second Amendment, however, directly address the question of religious exemptions from generally applicable laws, and those records suggest that the First Congress did not understand the meaning of free exercise to include religious exemptions from otherwise legitimate generally applicable laws.

64.    The context of the debates begins with the Anti-Federalists' criticism of the proposed constitution for the absence of a provision exempting religiously conscientious objectors from military service.[36] The criticism was sufficiently powerful that the state of Virginia proposed the following text as an amendment when ratifying the Constitution:

---

[35] See, Vincent Phillip Muñoz, *Religious Liberty and the American Founding: Natural Rights and the Original Meanings of the Religion Clauses* (Chicago, University of Chicago Press, 2022), Chapter 6.

[36] See Herbert Storing, *What the Anti-Federalists were For* (Chicago: University of Chicago Press, 1981), 97 n2.

> That any person religiously scrupulous of bearing arms ought to be exempted, upon payment of an equivalent to employ another to bear arms in his stead.[37]

Anti-Federalist criticisms led James Madison to propose the following when he submitted amendments to the First Congress on June 8, 1789:

> The right of the people to keep and bear arms shall not be infringed; a well armed and well regulated militia being the best security of a free country; but no person religiously scrupulous of bearing arms shall be compelled to render military service in person.[38]

After a few comments pertaining to whether the religiously scrupulous should be made to pay an equivalent to be released from military service, Congressman Egbert Benson of New York moved to eliminate the conscientious objector provision altogether. He is recorded as saying:

> Mr. Benson moved to have the words "but no person religiously scrupulous shall be compelled to bear arms," struck out. He would always leave it to the benevolence of the Legislature, for, modify it as you please, it will be impossible to express it in such a manner as to clear it from ambiguity. No man can claim this indulgence of right. It may be a religious persuasion, but it is no natural right, and therefore ought to be left to the discretion of the Government. If this stands part of the constitution, it will be a question before the Judiciary on every regulation you make with respect to the organization of the militia, whether it comports with this declaration or not. It is extremely injudicious to intermix matters of doubt with fundamentals.[39]

Benson's statement addressed the two issues under discussion. Leaving exemptions to the legislature would allow the First Congress to avoid the difficult issues pertaining to eligibility and potential payments required in lieu of service. More fundamentally, Benson argued that religious exemptions from militia service should not be a constitutional right because they are not a part of the natural right to religious liberty. Benson seems to have supposed that, at least pertaining to religious liberty, specific textual protections should be limited to natural rights. His comment about "discretion" suggests that he anticipated constitutional rights to be categorical. If exemptions were recognized as a constitutional right, granting them could not be balanced in light of other competing governmental interests. Relatedly, Benson also feared that a

---

[37] *The Founders' Constitution,* eds. Philip B. Kurland and Ralph Lerner (Chicago: University of Chicago Press, 1987), 5:16 (Virginia). The same proposed amendment was advanced in North Carolina and Rhode Island. Minorities from the Pennsylvania and Maryland ratifying conventions also proposed amendments related to conscientious objection from military service. See, Muñoz, *Religious Liberty and the American Founding*, 198-200.

[38] *Annals of Congress*, 1st Cong., 1st sess., 451.

[39] *Annals of Congress*, 1st Cong., 1st sess., 779–80.

constitutional right to conscientious objection would involve the judiciary "on every regulation … with respect to the organization of the militia." Clearly anticipating judicial review, he seems to have believed that conscientious objectors' lawsuits would invite improper judicial oversight over the organization of the militia. Benson did acknowledge that the government could "indulge" conscientious objectors, but if such a privilege were to be extended, he said the matter properly belonged to the legislature. He appears not to have worried about the insufficiency of discretionary legislative exemptions, remarking that the legislature "will always possess humanity enough to indulge this class of citizens in a matter they are so desirous of."[40]

65.    Benson's comments appear to have garnered substantial, though not majority, support in the House. Immediately after his statement, a motion was made to strike out the exemption clause. It failed by a vote of twenty-two to twenty-four.[41]

66.    Three days later, on August 20, the House again debated the provision. This time, Thomas Scott from Pennsylvania raised objections. He repeated Benson's criticism that the matter was "a legislative right altogether."[42]

67.    Representative Elias Boudinot of New Jersey is the only person recorded as responding to Scott. A Presbyterian and future president of the American Bible Society, Boudinot said he hoped "that in establishing this Government, we may show the world that proper care is taken that the Government may not interfere with the religious sentiments of any person…. By striking out the clause," he continued, "people may be led to believe that there is an intention in the General Government to compel all its citizens to bear arms."[43]  After Boudinot's comments, the record includes the following: "Some further desultory conversation arose, and it was agreed to insert the words 'in person' to the end of the clause; after which, it was adopted.…"[44]

68.    The restoration of Madison's original "in person" is significant. The phrase "but no person religiously scrupulous shall be compelled to bear arms in person" suggests that the

---

[40] *Annals of Congress*, 1st Cong., 1st sess., 780.

[41] *Annals of Congress*, 1st Cong., 1st sess., 780.

[42] Scott added a second objection as well. If religious objectors could neither be called to service nor be made to pay an equivalent, he said, "a militia can never be depended upon." Scott seemed to be particularly vexed by the problem of draft-bed conversions. With uncompensated exemptions available, "the generality of persons will have recourse to these pretexts to get excused from bearing arms." *Annals of Congress*, 1st Cong., 1st sess., 796.

[43] *Annals of Congress*, 1st Cong., 1st sess., 796.

[44] *Annals of Congress*, 1st Cong., 1st sess., 796.

House viewed exemptions from military service more as a privilege than as a right. At the time, Quakers and others who opposed bearing arms were equally averse to obtaining substitutes or paying for an equivalent.[45] If religious individuals were understood to possess a right not to perform military service on account of conscientious objection, then, for the same reason, they would also seem to possess a right not to be legally compelled to find or pay for an equivalent. The reinsertion of "in person" therefore suggests that the House understood conscientious objection not to override all of a citizen's civil obligations. Stated differently, the inclusion of "in person" reflects the evident judgment by the House that the state can legitimately and knowingly prescribe conduct that burdens religious individuals' consciences. By restoring "in person," the House rejected Boudinot's hope that they "show the world that proper care is taken that the Government may not interfere with the religious sentiments of any person."

69.    On September 9, 1789, the Senate eliminated the conscientious objector provision altogether.[46] No record exists of the Senate's deliberations on this point.

70.    Several points can be gleaned from Congress's debates over the right to conscientious objection from military service. Clearly, some members of the First Congress understood the matter to be one of principle. A few articulated the opinion that the right of religious freedom itself demanded a constitutionally recognized provision for exemptions from military service. Other House members rejected that argument, claiming that the matter was not

---

[45] According to Ellis M. West, "The Right to Religion-Based Exemptions in Early America: The Case of Conscientious Objectors to Conscription," *Journal of Law and Religion* 10 (1993/1994): 381:

> The [military service] exemptions granted to conscientious objectors [in early America] were seldom, if ever, considered by them to be adequate or satisfactory because they were limited or conditional in nature. To avoid military service, the objectors had to secure a substitute or pay a fine or special tax. It is quite clear, moreover, that the lawmakers who imposed the fines or taxes considered them to be the equivalent to [sic] military service, and their amount was set accordingly. As a result, the exemptions were rejected by most Mennonites, Brethren, and Quakers, some of whom suffered imprisonment and loss of property for failure to serve, pay a fine/tax, or secure a substitute. Moreover, the lawmakers in the various states were quite aware that pacifists objected to paying a fine or tax in lieu of military service.

Emphasis in the original. Material cited by West includes Peter Brock, *Pacifism in the United States: From the Colonial Era to the First World War* (Princeton, NJ: Princeton University Press, 1968), 199–200; R. R. Russell, "Development of Conscientious Objector Recognition in the United States," *George Washington Law Review* 20 (1952): 409–48; Richard K. MacMaster, Samuel L. Horst, and Robert F. Ulle, *Conscience in Crisis: Mennonites and Other Peace Churches in America, 1739–1789* (Scottdale, PA: Herald Press, 1979), 62–63, 354–91, 523–25, 532; Richard K. MacMaster, *Land, Piety, Peoplehood* (Scottdale, PA: Herald Press, 1985), 256–57.

[46] *Senate Journal*, 1st Cong., 1st sess., September 9, 1789, 77.

one of natural or constitutional right, but only of legislative discretion. Congressman Egbert Benson spoke against conscientious exemptions, partly because they would necessarily lead to judicial review of certain legislative and executive actions. A majority in the House voted to allow conscientious objectors to abstain from military service in person, but the majority did not recognize a more general right to be exempt from civic obligations wherever they conflicted with one's religious beliefs. Finally, Congress as a whole considered and rejected a constitutional right to exemption based on religion.

71.     Perhaps most importantly for our immediate purposes, no evidence exists to suggest that any member of the House connected the debate over conscientious objectors to the debate over the text that would become the Free Exercise Clause. The House's debate over religious exemptions occurred within the context of drafting what would become the Second Amendment, not the First. On August 20, immediately preceding the Scott-Boudinot exchange about the constitutional propriety of exemptions, the House adopted the following text:

> Congress shall make no law establishing religion, or to prevent the free exercise thereof, or to infringe the rights of conscience.[47]

No evidence exists to indicate that Boudinot ever suggested that this free exercise text protected conscientious objectors. The fact that the House continued to debate a conscientious objector provision immediately after it had adopted language protecting "free exercise" suggests that it did not consider "free exercise" to include the right to exemptions from generally applicable laws.

72.     If "free exercise" were commonly understood to include religious exemptions from burdensome generally applicable laws, then surely some member of Congress would have connected the two debates and suggested that the text prohibiting Congress from making a law "to prevent the free exercise" of religion also protected conscientious objectors. No member of the House connected the debate over conscientious exemptions from military service to the text protecting religious free exercise. Just as no one suggested that a separate conscientious objector provision was redundant because exemptions were already provided by the "free exercise" language, no one suggested that a separate conscientious objector provision was needed because religious free exercise exemptions would not be sufficient. There simply is no evidence that

---

[47] *Annals of Congress*, 1st Cong., 1st sess., 796.

anyone made any connection between the just-adopted language protecting religious "free exercise" and religious exemptions.

73.     The concurrent but separate discussions in the House on a right to religious free exercise, on the one hand, and on religious exemptions from military service, on the other, seem to indicate that the members of the House did not understand religious free exercise to include exemptions from generally applicable laws.

74.     This conclusion is also suggested by the Anti-Federalists' demand that a right to conscientious objection be recognized in addition to a right to religious free exercise. The states whose majorities proposed a conscientious objector amendment (Virginia, North Carolina, and Rhode Island) also proposed an amendment recognizing that "all men have an equal, natural, and unalienable right to the free exercise of religion, according to the dictates of conscience." If these states thought that this language granted religious exemptions from burdensome laws, then they would not have needed to propose an additional conscientious objector amendment.[48]

I.     **That the Original Understanding of the First Amendment Right of Religious Free Exercise Does Not Include a Constitutional Right of Exemption from Otherwise Valid State Actions is Suggested by the Founders' Political Philosophy of Natural Rights Social Compact Constitutionalism.**

75.     In the Founding-era state charters of government and in the leading public, church-state documents of the Founding era, the Founders referred to religious liberty as an "unalienable" natural right.[49] The concept of inalienablity (or "unalienability") has a precise meaning within the Founders' natural rights social compact political philosophy of government.[50] The Founders' social compact theory, to simplify, can be divided into three analytical steps:

A.  All individuals are, by nature, born equally free and thus possess certain natural rights.

B.  To protect their rights, free and independent individuals voluntarily enter into society with one another and then form a constitution to govern themselves. When forming civil

---

[48] The minority in Maryland, similarly, proposed both an exemption from bearing arms for those "conscientiously scrupulous" of doing so, and a separate amendment stating that "all persons be equally entitled to protection in their religious liberty." "Address of a Minority of the Maryland Ratification Convention," May 6, 1788, in *The Complete Anti-Federalist*, ed. Herbert Storing (Chicago: University of Chicago Press, 1981), 5:97.

[49] See Muñoz, *Religious Liberty and the American Founding*, Chapter 1.

[50] See Muñoz, *Religious Liberty and the American Founding*, Chapter 2; Vincent Phillip Muñoz, "Justice Scalia was Right about Religious Free Exercise," *Law and Religious Forum* (online journal), originally posted on September 6, 2016 at https://lawandreligionforum.org/2016/09/06/munoz-justice-scalia-was-right-about-religious-free-exercise/#more-29965.

society and then a government, individuals alienate—that is, they entrust to the government—their executive power to protect and enforce their rights. Legitimate government arises via consent, and the primary purpose of government is to protect natural rights.

C.  Some natural rights are fully inalienable, however. Direct authority over these natural rights is not granted to the government. Even within the social compact, individuals retain full and complete sovereignty over their non-alienated natural rights.

76.     That the Founders understood the free exercise of religious worship according to conscience to be an inalienable natural right can be seen in the Founding-era state declarations of rights, the Founders' philosophical defenses of religious liberty—including Thomas Jefferson's Virginia Statute for Religious Liberty (1786) and James Madison's Memorial and Remonstrance (1785)—and in influential political sermons of the time.[51] The inalienable character of the individual's authority over worship meant that the state could never legitimately acquire sovereignty over religious exercises per se.

77.     Religious exercises, accordingly, remain beyond the jurisdiction of government. This means that state officials lack legitimate authority to directly prohibit, mandate, or otherwise regulate religious exercises as such. The government improperly exercising authority over religious exercises as such is the core mischief the Free Exercise Clause was designed to remedy. A construction of the Free Exercise Clause consistent with the Founders' inalienable natural rights political philosophy would prohibit the federal and state governments from punishing, prohibiting, mandating, or otherwise regulating religious exercises as such.[52] It would limit government to its proper sphere of authority and require government to exercise only those powers and remain within the jurisdiction delegated to it by the people.

78.     The state's lack of jurisdiction over religious exercises as such also means that judges—who, too, are agents of the state—lack authority to balance elements of the inalienable

---

[51] The influential Baptist preacher Samuel Stillman, for example, preached the following in Boston in 1779:

> That some of the natural rights of mankind are unalienable, and subject to no control but that of the Deity. Such are the Sacred Rights of Conscience. Which in a state of nature, and of civil society are exactly the same. They can neither be parted with nor controlled, by any human authority whatever.

Samuel Stillman, *A Sermon Preached Before the Honorable Council, and the Honorable House of Representatives of the State of Massachusetts-Bay, in New-England, at Boston, May 26, 1779* (Boston: T. and J. Fleet, 1779), 11.

[52] Muñoz, *Religious Liberty and the American Founding*, 229-35.

natural right to religious liberty against other state interests. The act of balancing itself assumes jurisdiction: The "balancer" places competing rights and interests on a scale. Even if the scale is tilted toward religious freedom, the act of weighing assumes an authority that the Founders deny. Judges may not exercise such authority because the government itself lacks jurisdiction over religious exercises as such.

79.    The government's absence of jurisdiction over religious exercises as such thus counsels a narrow but deep construction of the Free Exercise Clause's protection. The Free Exercise Clause, again, protects against government prohibition, prescription, and regulation of religious exercises as such; it was not designed to extend to religious believers exemptions from otherwise valid laws that lie properly within the government's jurisdiction.

**J.    The First Amendment's Free Exercise Clause Was Originally Designed to Impose a Categorical Limitation on the Government's Jurisdiction Vis-à-vis Religious Exercises as Such. It Was Not Designed to Provide Religious Exemptions from Otherwise Valid Exercises of State Power, Such as Mandatory Oaths of Office.**

80.    The constitutional safeguard established by the First Amendment's Free Exercise Clause was designed to impose a fixed and categorical limit on the exercise of governmental power. The Federal Congress, for example, was prohibited from making a law establishing articles of religious faith to which every American citizen must profess or from imposing penalties on specific forms of worship. The categorical limitation on governmental power is communicated by the Constitution's text: "Congress shall make no law …." "No law" originally meant no law; Congress was deprived of making any law that prohibits the free exercise of religion.

81.    Because of its categorical character, the content of the Constitution's prohibition is relatively narrow. Congress (and with incorporation, the States) can make no law that specifically targets a religious exercise as such–it cannot, for example, ban the Catholic sacrament of confession or declare that individuals must attend worship services on Sunday (or Saturday). As I have explained in my scholarly work, the First Amendment's Free Exercise Clause imposes jurisdictional limits on state power–Congress cannot legislate directly on the subject matter of religious exercises as such.[53]

---

[53] See Muñoz, *Religious Liberty and the American Founding*, Chapter 7.

82.     An oath of office that does not include a profession of religious belief or religious content does not fall within the scope of the First Amendment's limitations on government power, at least as that protection was originally conceived. In its original understanding, the First Amendment's Free Exercise Clause would prohibit explicitly religious oaths for office, e.g., an oath that required the oath taker to affirm belief in "the Old and New Testament." Originally conceived the First Amendment overlaps with the Constitution's prohibition on religious tests for office.

83.     Fixed constitutional limitations imposed by the First Amendment were not the only way the original Constitution was designed to protect the interests of religious citizens. Religious individuals and religious liberty interests also could be protected politically, i.e. through legislation. The primary manner to protect religious individuals and religious liberty interests is for legislators to craft laws in such a way that they accommodate the religious sensibilities of the people who live under them.

84.     The State of California accomplishes the accommodation of religious individuals and religious liberty interests in the same way that the Founding Fathers did in the Federal Constitution—by permitting oath takers to swear or affirm the prescribed oath of allegiance.


I declare under the penalty of perjury of the laws of the State of California and of the State of Indiana that the foregoing is true and correct to the best of my understanding.

Executed this November 22, 2024


_____
Vincent Phillip Muñoz
*Declarant*

27

# VINCENT PHILLIP MUÑOZ

Tocqueville Professor of Political Science
Concurrent Professor of Law
University of Notre Dame
2032 Jenkins Nanovic Halls
Notre Dame, IN 46556
(574) 631-0489 / vmunoz@nd.edu

## ACADEMIC POSITIONS

- University of Notre Dame, 2009-present
  - Tocqueville Professor, Department of Political Science and Concurrent Professor of Law (2023)
  - Tocqueville Associate Professor and Concurrent Associate Professor of Law (with tenure, 2011)
  - Founding Director, Center for Citizenship & Constitutional Government (2021-present)
- University of Texas at Austin, School of Civic Leadership, Distinguished Visiting Professor, 2024-25
- Princeton University, William E. Simon Visiting Fellow in Religion & Public Life, 2008-2009
- Tufts University, Assistant Professor, 2005-2009
- Seattle University School of Law, Faculty Affiliate, 2008
- North Carolina State University, Assistant Professor, 2001-2005
- Claremont McKenna College, Visiting Assistant Professor—D.C. Program, 2003-2004
- Pomona College, Lecturer in Politics and Critical Inquiry, 1998-2001
- California State University, San Bernardino, Visiting Instructor, 1996-1998

## EDUCATION

- Claremont Graduate School, Ph.D. Political Science, 2001
  Major Fields:    American Politics and Political Philosophy
  Dissertation:    *Religious Liberty and American Constitutionalism: John Locke, the American Founders, and the Free Exercise Clause*
- Boston College, MA Political Science, 1995 (with honors)
  Concentrations:    American Politics and Political Philosophy
- Claremont McKenna College, BA Economics and Government, *magna cum laude*, 1993
  Honors thesis:    "Aquinas' Theory of Natural Law"

| RESEARCH AREAS | TEACHING FIELDS |
| --- | --- |
| Church-State Jurisprudence | American Political Thought |
| The American Founding | History of Political Thought |
| Early Modern Political Thought | Constitutional Law/Jurisprudence |
| Natural Rights Constitutionalism | American Presidency/Executive Power |

## ACADEMIC AWARDS, FELLOWSHIPS, AND GRANTS RECEIVED

- Non-residential Fellow, Civitas Institute, University of Texas, 2022-24
- Department of Education, GAANN Grant, 2019-23 ($597,000)
- 2020 Charles E. Test Lecturer – Princeton University
- National Endowment for the Humanities, 2019-20 ($60,000)
- Institute for Humane Studies – George Mason University, 2019 ($15,000)
- Arizona State University, Visiting Faculty Fellowship, 2019 ($5,500)
- Rev. Edmund P. Joyce, C.S.C. Award for Excellence in Undergraduate Teaching, University of Notre Dame, 2016
- Notre Dame Institute for Scholarship in the Liberal Arts: 2022 ($1000), 2016 ($2,000), 2013 ($5,000), 2010 ($2,500)
- Notre Dame Institute for Advanced Study, 2014 Sabbatical Grant (awarded but not accepted)
- Earhart Foundation, 2014 ($35,000)
- James Madison Fellowship, Princeton University, 2008 ($47,000)
- *Civitas* Fellowship, The Pew Charitable Trust, 2003-2004 ($16,000)
- National Endowment for the Humanities, Summer Seminar Fellow, 2003 ($3,600)
- Summer Faculty Research Grant – North Carolina State University, 2002 ($5,000)
- *Civitas* Fellow, The Center for Public Justice, 2001 ($3,000)
- Claremont Graduate University Dissertation Grant, 2000-2001 ($5,000)
- Humane Studies Fellowship, Institute for Humane Studies, 1999-2001 ($6,000)
- Salvatori Fellowship for the Study of the American Founding, Intercollegiate Studies Institute, 2000 ($10,000)
- Bradley Fellowship, 1997-1999 ($27,000 + tuition)
- Summer Research Fellow, Institute for Humane Studies, 1998 ($3,000)
- Earhart Fellowship, 1995-1997 ($24,000 + tuition)
- John M. Olin Fellowship, 1996 ($3,000)
- Bradley Fellowship, 1993-1995 ($10,000 + tuition)

## GIFTS & GRANTS TO SUPPORT DIRECTED ACADEMIC PROGRAMS

- Cueno Foundation ($250,000), 2023
- John Menard Foundation ($1,200,000), 2020-23
- Napa Institute ($1,500,000), 2019-26
- Bradley Foundation, 2018-24 ($150,000)
- Charles G. Koch Charitable Foundation, 2011-2019 ($1,639,650)
- M&T Foundation, 2016-2018 ($3,050,000)
- Jack Miller Foundation, 2011-2019 ($114,000)
- Institute for Scholarship in the Liberal Arts, University of Notre Dame, 2013 ($5,000)
- Provost's Grant for Constitution Day Programming, 2013-15 ($4,500)
- Miller Center for the Teaching of America's Founding Principles, 2007 ($10,000)
- More than $10,000,000 in gifts and pledges from private individuals

## SUPREME COURT CITATIONS

- *Fulton v. City of Philadelphia*, 593 U.S. ___ (2021), slip op. at 30 n.34, 50-51, 51 n. 69, 71 n. 81, Justice Alito's concurring opinion citing "The Original Meaning of the Free Exercise Clause: The Evidence from the First Congress"
- *Espinoza v. Montana Department of Revenue*, 591 U.S. ___ (2020), slip op. at 15 n.3, Chief Justice Robert's majority opinion citing *God and the Founders*
- *Espinoza v. Montana Department of Revenue*, 591 U.S. ___ (2020), slip op. at 3, Justice Thomas's concurring opinion citing "The Original Meaning of the Establishment Clause and the Impossibility of Its Incorporation"
- *Town of Greece v. Galloway*, 572 U.S. 565, 606 (2014), Justice Thomas's concurring opinion citing "The Original Meaning of the Establishment Clause and the Impossibility of Its Incorporation"

## GOVERNMENT TESTIMONY

- Department of Justice, Forum on Free Speech in Higher Education, September 17, 2018
- Senate Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Property Rights Hearing, "Beyond the Pledge of Allegiance: Hostility to Religious Expression in the Public Square," June 8, 2004

## BOOKS

- *Religious Liberty & the American Founding: Natural Rights and the Original Meanings of the First Amendment Religion Clauses*. University of Chicago Press, 352 pages. 2022
  - o Subject of a five-scholar symposium in *American Political Thought*, v. 12 (2023)
- *God and the Founders: Madison, Washington, and Jefferson*, Cambridge University Press, 254 pages. 2009
  - o Recipient of the Hubert Morken Award from the American Political Science Association for the best book in religion and politics in 2009-2010
  - o Cited by Chief Justice John Roberts in *Espinoza v. Montana Department of Revenue*, 591 U.S. ___, slip op. at 15 n.3 (2020)

## EDITED CONSTITUTIONAL LAW CASEBOOKS

- *Religious Liberty and The American Supreme Court: The Essential Cases & Documents*
  Edited First Amendment church-state casebook designed for classroom and reference use. Rowman & Littlefield, 654 pages. 2013. Revised edition, 2015
- *American Constitutional Law, Vol. I: The Structure of Government*
  *American Constitutional Law, Vol. II: The Bill of Rights and Subsequent Amendments*
  Co-edited with Ralph Rossum & G. Alan Tarr two-volume constitutional law case book designed for undergraduate classroom use. Rutledge, 630 and 880 pages. 11th edition, 2020

## REFEREED JOURNAL ARTICLES, LAW REVIEW ARTICLES & REFEREED BOOK CHAPTERS

- "History and Tradition in the Trump Justices' Church-State Jurisprudence"
  *The ANNALS of the American Academy of Political and Social Science* [forthcoming]
- "What is an Establishment of Religion? And What Does Disestablishment Require?"
  *Constitutional Commentary* [forthcoming]
- "Liberty and the Good in the American Founding," in *Beyond Classical Liberalism*, eds. James Dominic Rooney and Patrick Zoll (New York: Routledge, 2024): 241-50

- "Response to Jonathan Ashbach"
  *American Political Thought* 12 (2023): 417-23
- "Constructing the Establishment Clause," with Kate Hardiman Rhodes
  *Loyola University Chicago Law Journal* 54 (2022): 387-453
- "James Madison's Political Science of Religious Liberty"
  *American Political Thought* 10, no. 4 (2021), pp. 552-76
- "Two Concepts of Religious Liberty: The Natural Rights and Moral Autonomy Approaches to the Free Exercise of Religion," *American Political Science Review* 110, no. 2 (2016), pp. 369-81
  o Subject of a nine-scholar forum hosted by St John's Law School Center for Law & Religion
  o Republished in *The Cambridge Companion to the First Amendment and Religious Liberty*, eds. Michael D. Breidenbach and Owen Anderson (New York: Cambridge University Press, 2019): 276-306
- "If Religious Liberty Does Not Mean Exemptions, What Might It Mean? The Founders' Constitutionalism of the Inalienable Rights of Religious Liberty"
  *Notre Dame Law Review* 91, no. 4 (2016), pp. 1387-1417
- "How the Founders Agreed about Religious Freedom but Disagreed about the Separation of Church and State," with Kevin Vance, in *The Wiley Blackwell Companion to Religion and Politics in the U.S.*, ed. Barbara McGraw (Oxford, UK: John Wiley & Sons, 2016), pp. 85-97
  o Republished in *Civil Religion in Modern Political Philosophy: Machiavelli to Tocqueville*, eds. Frankel, Doneson, and Yaffe (University Park, PA: Penn State University Press, 2020)
- "Church & State in the Founding-era State Constitutions"
  *American Political Thought* 4, no. 1 (2015), pp. 1-38
- "The Founding Fathers' Competing Visions for the Proper Separation of Church and State," in *Religious Freedom in America: Constitutional Roots and Contemporary Challenges*, ed. Allen D. Hertzke (Norman, OK: University of Oklahoma Press, 2015), pp. 53-68 (adapted from previously published material)
- "The Founding Fathers' Disagreements about Church and State," in *Resistance to Tyrants, Obedience to God*, eds. Gish and Klinghard (Lanham, MD: Lexington Books, 2013), pp. 169-82 (adapted from previously published material)
- "The Original Meaning of the Free Exercise Clause: The Evidence from the First Congress"
  *Harvard Journal of Law and Public Policy* 31, no. 3 (2008), pp. 1083-1120
  o Multiple citations by Justice Samuel in *Fulton v. City of Philadelphia*, 593 U.S. ___ (2021)
- "The Original Meaning of the Establishment Clause and the Impossibility of its Incorporation"
  *University of Pennsylvania Journal of Constitutional Law* 8, no. 4 (2006), pp. 585-639
  o Cited by Justice Clarence Thomas in *Espinoza v. Montana Department of Revenue*, 591 U.S. ___, slip op. at 3 (2020)
  o Cited by Justice Clarence Thomas in *Town of Greece v. Galloway*, 572 U.S. 565, 606 (2014)
- "Thou Shalt Not Post the Ten Commandments? *McCreary, Van Orden*, and the Future of Religious Display Cases," *Texas Review of Law and Politics* 10, no. 2 (2006), pp. 357-400
- "James Madison's Principle of Religious Liberty"
  *American Political Science Review* 97, no. 1 (2003), pp. 17-32
- "George Washington on Religious Liberty"
  *The Review of Politics* 65, no. 1 (2003), pp. 11-33

## NON-REFEREED BOOK CHAPTERS

- "Defending American Natural-Rights Republicanism," in *Leisure with Dignity: Essays in Honor of Charles R. Kesler*, eds. Michael Anton and Glenn Ellmers (New York: Encounter, 2024): 149-65

- "Conscience, Conformity, and Religious Diversity in the American Founding," in *Diversity, Conformity, and Conscience in Contemporary America*, ed. Bradley Watson (Lexington Books, 2019)

- "Thomas Jefferson's Philosophy of Religious Freedom: The Political Philosophy of the Virginia Statute for Religious Freedom," in *The Crisis of Religious Liberty: Reflections from Law, History, and Catholic Social Thought*, ed. Stephen Krason (Lanham, MD: Rowman & Littlefield, 2015), pp. 49-66 (revised version of my Jefferson chapter in *God and the Founders*)

- "The Place of Religion Among the American Founders," in *A Second Look at First Things*, eds. Beckwith, George, and McWilliams (South Bend, IN: St. Augustine Press, 2013), pp. 190-205 (adapted from previously published material)

- "Religion in the Life, Political Thought, and Presidency of James Madison," in *Religion and the Presidency*, ed. Mark Rozell (New York: Palgrave McMillan, 2007), pp. 51-72

- "Current Separation of Church and State Doctrine: Suppressing Public Displays of Faith," in *You Decide! 2006: Current Debates in American Politics*, ed. John T. Rourke. (New York: Pearson/Longman, 2005), pp. 53-54

- "Religion and the Common Good: George Washington on Church and State," in *The Founders on God and Government*, eds. Dreisbach, Hall, and Morrison (Lanham, MD: Rowman & Littlefield, 2004) pp. 1-22 (revised version of "George Washington and Religious Liberty," originally published in *The Review of Politics*)

## REVIEWS & ESSAYS

- "The Right of Conscience: Progressive Versus Conservative Understandings of Religious Liberty" *First Principles Essay Series*, The Heritage Foundation, October 2024

- Review of *The Classical and Christian Origins of American Politics: Political Theology, Natural Law, and the American Founding*, by Kody W. Cooper and Justin Buckley Dyer (Cambridge University Press, 2022) *Perspectives on Politics*, v. 22 (2024): 872-73

- "A Natural Rights Approach to Religious Liberty" *Anchoring Truths*, July 21, 2023

- "Before Critiquing the American Founding, We Should First Understand It" *Public Discourse*, October 31, 2022

- "What is an Establishment of Religion?" *First Things*, May 27, 2022

- "Natural Rights and Religious Liberty: The Founders' Perspective" *Real Clear Politics*, April 21, 2021

- "More is Needed" Review of *Divided We Fall* by David French, *First Things*, December 2020

- "The Founders' Religious Liberty, Beyond Rakove" Review of *Beyond Belief, Beyond Conscience* by Jack Rakove, *Law & Liberty*, October 26, 2020

- "No 'Wall of Separation,'" *First Things*, July 9, 2020

- "*Espinoza*: Roberts v. Thomas on the Future of Religious Liberty Jurisprudence" *George Washington Law Review On the Docket*, July 3, 2020

- "A Learned but Dismissive Take on Conservative Constitutionalism" Review of *Conservatives and the Constitution* by Ken Kersch, *Law & Liberty*, January 1, 2020

- "Religious Liberty and Religious Exemptions: A Response to Yoo and Phillips"
  *National Review Online*, December 26, 2018
- "How the Founders Protected the Natural Right of Religious Liberty"
  *National Review Online*, December 7, 2018
- "Securing Free Speech and Free Inquiry on Campus," *Public Discourse*, September 17, 2018
- "The Ingredient for an LGBT Triumph?" *Berkley Forum*, June 27, 2018
- "Defending American Classical Liberalism," *National Review Online*, June 11, 2018
- "A Bad Aftertaste in the *Masterpiece Cakeshop* Decision," *AmericanGreatness.com*, June 9, 2018
- "Natural Rights, God, and Marriage in the American Founding," *Public Discourse*, May 23, 2018
- "Free Exercise Exemptionism and the Evaporation of the Inalienable Character of Religious Liberty,"
  *Journal of Law and Religion* 32 (2017): 512-14
- "How is Equality Baked into Our Constitution?" *AmericanGreatness.com*, December 5, 2017
- "Why I Invited Charles Murray to Speak at Notre Dame," *Real Clear Politics*, March 22, 2017
- "The Founders in Full," *Claremont Review of Books,* XVII, no. 4, Fall 2017
  Review of *The Political Theory of the American Founding* by Thomas G. West
- "The Founders and the Natural Right of Religious Free Exercise: A Response," *Law and Religion Forum* lawandreligionforum.org (St. John's University Law School Center for Law & Religion), January 24, 2017
- Review of *Rediscovering America: Liberty, Equality, and the Crisis of Democracy* by John Agresto, *Review of Politics* 79 (2017)
- "Justice Scalia was Right about Religious Free Exercise," *Law and Religion Forum* (St. John's University Law School Center for Law & Religion), September 6, 2016
- "A More Accommodating Accommodation? Justice Kennedy's Invitation to Compromise"
  *Commonweal.com,* July 16, 2014
- "Justice Sotomayor Misses the Mark: Religious Non-Profits Should Prevail"
  *Public Discourse,* July 8, 2014
- "The Soul of Liberty," *Claremont Review of Books* XIV, no. 2, Spring 2014
  Review of *Conscience and Its Enemies* by Robert P. George
- "Sustaining American Liberalism in Principle and Practice"
  *Public Discourse,* March 5, 2013
- "Why Social Conservatives Should Be Patriotic Americans: A Critique of Patrick Deneen"
  *Public Discourse,* November 28, 2012
- "The Religious Liberty Case Against Religious Liberty Litigation: Renewed Focus on Reasonable, Not Sectarian Arguments" *Public Discourse*, October 12, 2012
- "The Religious Liberty Case Against Religious Liberty Litigation: Non-Universal Exemptions and Judicial Overreach," *Public Discourse*, October 11, 2012
- "Catholic Bishops Take on Obama," *The Weekly Standard Online*, April 23, 2012
- "The Virtues of Conflict Over War Powers," with Benjamin Kleinerman, *The Weekly Standard Online*, June 16, 2011
- "Block that Metaphor," *Claremont Review of Books* X, no. 4, Fall 2010
  Review of *Church, State, and Original Intent* by Donald L. Drakeman
- "Saving the Pledge," *First Things*, no. 149, pp. 8-10, January 2005
- "One Nation, Under God?" *Claremont Review of Books* V, no. 3, Summer 2005
  Review of *To the Flag: The Unlikely History of the Pledge of Allegiance*, by Richard Ellis

- Review of *On Two Wings: Humble Faith and Common Sense at the American Founding* by Michael Novak and *The Founding Fathers and the Place of Religion in America* by Frank Lambert *Interpretation: A Journal of Political Philosophy* v. 31, no. 1, pp. 105-109, Winter 2004-05
- "Debating Free Exercise: Response to Critics," *First Things*, no. 142, April 2004
- "Establishing Free Exercise," *First Things*, no. 138, pp. 14-19, December 2003
- "Religious Liberty and The American Founding" *The Intercollegiate Review* 38, no. 2 (2003), pp. 33-43
- "A Postmodernist's Prayer," *Claremont Review of Books*, Spring 2003 Review of *Getting Over Equality: A Critical Diagnosis of Religious Freedom in America* by Steven D. Smith
- Review of *Farewell to Christendom: The Future of Church and State in America* by Thomas J. Curry. *Perspectives on Political Science*, Winter 2003
- "George Washington," in *Encyclopedia of American Religion and Politics*, eds. Paul A. Djupe and Laura R. Olson. Facts on File, 2003
- "A Wall of Separation?" *Claremont Review of Books*, Spring 2001 Review of *Religion and Political Culture in Jefferson's Virginia*, ed. G.W. Sheldon and D.L. Dreisbach, and *Religion and the New Republic*, ed. James H. Hutson
- Review of *The American Myth of Religious Freedom* by Kenneth R. Craycraft. *Perspectives on Political Science*, Winter 2001

## INVITED LECTURES

### 2023-24

Acton University
American Enterprise Institute
Arizona State University
Brigham Young University
Bucknell University
Catholic University of America
Claremont McKenna College
Georgetown Law School
Grand Valley State University
Gerard Ford Museum
Harvard University
Intercollegiate Studies Institute
Montreat College
UC Berkeley Law School (twice)
University of Nebraska-Omaha
University of Texas, Austin
University of Toledo
University of Virginia
University of Wisconsin (twice)
Utah Valley University
Taylor University
Thomistic Institute
Tufts University
United States Military Academy West Point

### 2003-2022

Akron University School of Law
American Enterprise Institute (twice)

America's Future Foundation
American University of Iraq (Sulaimani, Iraq)
Arizona State University (twice)
Baylor University (twice)
Belarusian State University
Benedictine College
Boise State University
Boston Collage
Cal Poly San Luis Obispo (twice)
Carroll College
Carthage College
Chapman University Law School
Christendom College
Claremont McKenna College (twice)
College of the Holy Cross
Cornell University Law School
Dartmouth University
Emory University
Ethics & Public Policy Center (twice)
Faulkner University
Franciscan University of Steubenville
Furman University
Georgia State University Law School
George Fox University
Georgetown University
Georgetown University Law School
Grand Valley State University
Grove City College
Harvard Law School

| | |
|---|---|
| Harvard College | University Faculty for Life |
| Hillsdale College (thrice) | UC Berkeley Law School |
| Holy Cross College | University of Cincinnati |
| Hope College | University of Chicago Law School |
| Huntington University | University of Dallas |
| Indiana University, School of Law | University of Kansas |
| Intercollegiate Studies Institute | University of Maryland |
| Jagiellonian University | University of Missouri |
| Kenyon College | University of Montana |
| Lee University | University of Nebraska Law School |
| Loyola University Chicago Law School | University of Nebraska, Omaha |
| Mercer University | University of Notre Dame Law School (thrice) |
| Middlebury College | University of Oklahoma (thrice) |
| Monmouth College | University of Portland |
| Newman University | University of Richmond Law School |
| North Carolina State University | University of San Diego |
| NYU Thomistic Institute | University of South Carolina |
| Oxford University | University of Virginia (twice) |
| Pomona College (twice) | University of Virginia Law School |
| Princeton Theological Seminary | University of Wisconsin (twice) |
| Princeton University (thrice) | University Bookman/Morningside Institute |
| Regent University | United States Department of Justice |
| Rutgers University, Camden Law School | United States Embassy: Minsk, Belarus |
| Seattle Pacific University | Utah Valley University |
| Saint Vincent College | Vanderbilt University, School of Law |
| Skidmore College | Wake Forest University |
| Texas State University | Washburn University, School of Law |
| Thomas Aquinas College | Western State University College of Law |
| Uline Corporation | Yale Law School |

## CONFERENCE PAPERS (SINCE 2008-09)

- "Defending American Natural-Rights Republicanism"
  Saving the Republic Statesmanship Colloquium, Hillsdale College, October 10-12, 2024

- "History and Tradition in the Trump Justices' Church-State Jurisprudence"
  Conference on "Donald J. Trump, the Supreme Court, and American Constitutionalism," *The ANNALS* of the American Academy of Political and Social Science, University of Pennsylvania, Sept. 9-10, 2024

- "Constructing the Establishment Clause" with Kate Hardiman Rhodes
  Loyola University Chicago Law Journal Symposium on "Religious Liberty at a Historic Crossroads," Chicago, April 8, 2022

- "James Madison's Politics of Religious Liberty"
  2021 American Political Science Association Meeting, Seattle, WA

- "Defending American Classical Liberalism"
  *First Things* Colloquium on Religious Faith and Liberalism, New York, June 18, 2018

- "Marriage and the Family in Tom West's *The Political Theory of the American Founding*"
  Hillsdale College," Hillsdale, MI, November 4, 2017

- "Social Compact Theory, Freedom of Worship, and Religious Liberty as an Inalienable Right"
  Jack Miller Center, Philadelphia, PA, August 9-12, 2017

- "Two Concepts of Religious Liberty," conference on "Religion in the Public Space of the Legal State of the 19th Through 20th Centuries," Jagiellonian University, Krakow Poland, April 27-29, 2016
- "The Theological Foundations of the Right to Privacy"
  Kenyon College conference on "The Expectation of Privacy," Kenyon, OH, April 6-8, 2016
- "Two Concepts of Religious Liberty: The Natural Rights and Moral Autonomy Approaches to the Free Exercise of Religion," Montpelier/Smith Center for the Constitution. Orange, VA, July 2015
- "Religious Diversity, Conformity, and Conscience in the American Founding," St. Vincent College conference on "Diversity, Conformity, and Conscience in Contemporary America," April 2015
- "Two Concepts of Religious Liberty"
  Jack Miller Center for Teaching America's Founding Principles and History, Philadelphia, PA, August 2013
- "Why Social Conservatives Should be Patriotic Americans"
  2012 Center for Ethics and Culture Fall Conference, University of Notre Dame, Notre Dame, IN
- "Church and State in the States: The Founding-Era State Constitutions"
  2009 American Political Science Association Meeting, Toronto, Canada
- "Religious Liberty and the American Founding: The State Constitutions"
  Georgetown University conference on "American Political Thought: Ideas and Institutions," Washington, DC, January 2009
- "Jefferson's Secular Politics of Church-State Separation"
  2008 American Political Science Association Meeting, Boston, MA
- "The Original Meaning of the Free Exercise Clause"
  2008 American Political Science Association Meeting, Boston, MA (nominated for the Paul J. Weber Award for best paper on religion and politics at the APSA meeting)
- "The Enlightenment and the American Founding"
  2008 Southern Political Science Association Meeting, New Orleans, LA (nominated for the Pi Sigma Alpha Best Paper Award)

## SELECTIVE CONFERENCE/COLLOQUIUM/PANEL PARTICIPATION (SINCE 2008)

- Panelist, "Securing Intellectual Diversity on Campus," Ohio Public University Governance Symposium, Columbus, OH, October 23, 2023
- Author, Author Meets Critics panel on *Religious Liberty and the American Founding*, with Harvey Mansfield (Harvard), Hon. Jeff Sutton (6th Circuit), Michael Moreland (Villanova), University of Notre Dame, September 22, 2023
- Moderator, "Cooper & Dyer's *The Classical & Christian Origins of American Politics*"
  2023 American Political Science Association Annual Meeting, (virtual), September 1, 2023
- Presenter, "The Founders on Religious Liberty and Church-State Relations," Princeton University, James Madison Program 2023 Giuffra Conference, "America's Once and Future History," June 6, 2023
- Presenter, "Domesticating Religion or Domesticating Politics? Why the Separation of Church and State Need Not be an Attack on Religion." Michigan State University / American Enterprise Institute conference on "Religion's Refusal to Die," Washington, DC, April 20-21, 2023
- Participant, "Liberalism/Post-Liberalism," University of Texas, Austin, April 12-13, 2023
- Panelist, "Originalism and the Free Exercise Clause: Should the Court Overturn *Smith*?"
  2023 Original Symposium, Federalist Society, University of Virginia Law School, March 24, 2023
- Director and Organizer, "The Principles of American Constitutionalism: Natural Rights & Natural Law," law faculty conference, February 9-10, 2023

- Discussant, "Citizenship, Character, and the Common Good," Southern Political Science Association Conference, Tampa, FL, January 12, 2023
- Author, Author Meets Critics panel on *Religious Liberty and the American Founding* featuring Teresa Bejan (Oxford), Rogers Smith (Penn), and George Thomas (Claremont McKenna) 2022 American Political Science Association Annual Meeting, Montreal, CA, September 17, 2022
- Panelist, "The Free Exercise Clause and the Supreme Court," 2022 Judicial Conference of the Sixth Circuit, Louisville, KY, September 2, 2022
- Panel Moderator, "The Leak, Abortion, and the Future of the Supreme Court," featuring John Yoo, Carter Snead, and Sherif Girgis, University of Notre Dame (zoom), May 3, 2022
- Keynote Lecture, "Natural Rights, Natural Law, and the American Founding" 2022 Shawnee Trail Conference on American Politics & Constitutionalism, April 28-29, 2022, Baylor University
- Organizer and Host, Conference on "The Reconstruction Amendments," University of Notre Dame, October 28-29, 2021. Proceedings to be published in *Notre Dame Law Review*
- Panelist, "Religious Exemptions from the Founding to Today," National Constitution Center (Zoom), September 30, 2021
- Panelist, Book panel on *The Unbroken Thread* by Sohrab Ahmari, Notre Dame Center for Ethics and Culture, May 6, 2021
- Panelist, "SCOTUS After the Barrett Nomination," Federalist Society, Florida Chapters Conference, Orlando, January 30, 2021
- Panelist, "Pandemic Consequences: Opportunities in Higher Education," Bradley Foundation, Lake Geneva, WI, October 9, 2020
- Panelist, "Challenges or Irreconcilable Differences? Nationalism, Markets, Morality, and Culture," Bradley Foundation, Naples, FL, January 25, 2020
- Panelist, "Catholicism and the Contemporary World," American Political Science Association Annual Meeting, Washington, DC, August 30, 2019
- Panelist, "The Declaration and the Constitution," Bradley Foundation Graduate and Post-Graduate Conference on "We the People: Fidelity to the Constitution," Chicago, IL, April 13, 2019
- Commentator, "*Masterpiece Cakeshop* and the Future of Religion Liberty," by Mark L. Movessian. Conference on "The Future of Religious Liberty," George Mason University, March 22, 2019
- Panelist, "Does Politics Need God," Thomistic Institute, New York University, March 9, 2019
- Panelist, "Issues in Religious Liberty," Federalist Society Midwest Regional Conference, University of Chicago, February 23, 2019
- Commentator, "'A Free and Sovereign State': The Emergence of the Concept of Sovereignty in Iceland," by Ragnhildur Helgadottir. Conference of "History and Theory in Development of Public Law," University of Notre Dame in London, February 14-15, 2019
- Keynote Panelist, "Catholicism and the American Project," Notre Dame Center for Ethics and Culture Fall Conference, November 3, 2018
- Panelist, "Can God Save the University? The Religious Roots of an Academic Crisis," conference on "The Catholic Intellectual and the Challenge of the Contemporary University," NYU Thomistic Institute, April 21, 2018
- Panel Organizer and Moderator, "Author Meets Critics: Tom West's *The Political Theory of the American Founding*," 2018 MPSA Annual Meeting, Chicago, IL, April 7, 2018
- Panel Commentator, "Federalists and Anti-Federalists," 2017 MPSA Annual Meeting, Chicago, IL, April 6, 2017

- Panelist, "Is the Religious Freedom Restoration Act the Future of Religious Liberty?" Federalist Society Lawyer's Convention, Washington, DC, November 17, 2016
- Session Designer and Leader, St. John's Center for Law & Religion Conference on "Tradition in Law and Politics," New York, NY, October 20-22, 2016
- Discussant, "Freedom of Religion and Speech in the American Social Compact," 2016 APSA Annual Meeting, Philadelphia, PA, September 2, 2016
- Chair, "The Jurisprudence and American Legacy of Justice Antonin Scalia," 2016 APSA Annual Meeting, Philadelphia, PA, September 3, 2016
- Commentator, Roundtable conference on Linda Brady's *The Distinctiveness of Religion in American Law*, Notre Dame Law School, April 15, 2016
- Paper Presenter and Discussant, "Religious Liberty and the Future of Liberal Tolerance," Claremont McKenna College, May 19-21, 2016
- Chair & Discussant, "Can the Left Get Right with the Founding?" 2016 SPSA Annual Meeting, San Juan, Puerto Rico, January 2016
- Roundtable Participant, "Sebelius v. Hobby Lobby: The Morning After Pill, Corporate Convictions, and the Future of Religious Liberty," 2014 American Political Science Association Annual Meeting, Washington, DC, September 2014
- Chair and Panel Organizer, "Benjamin Radclif's *The Political Economy of Human Happiness: How Voters Choices Determine the Quality of Life*," 2014 American Political Science Association Annual Meeting, Washington, DC, September 2014
- Moderator, "The Supreme Court and Social Progress: *Roe v. Wade at 40*," conference on the Milestones in the History of a Free Society, Princeton University, May 2013
- Chair, Discussant, and Panel Organizer, "Author Meets Critics, *American Grace* by Robert Putnam and David Campbell," 2012 Southern Political Science Association Meeting, New Orleans, January 2012
- Discussant, "Liberalism and the Rule of Law," 2012 Southern Political Science Association Meeting, New Orleans, January 2012
- Discussant, "*Church, State, and Original Intent*," panel on *Church, State, and Original Intent* by Donald L. Drakeman, Princeton University, April 2010
- Discussant, "The American Founders and Free Speech," 2009 American Political Science Association Meeting, Toronto, CA
- Participant, "The Constitution & The Bill of Rights," Claremont McKenna College, Claremont, CA, May 2009
- Consultant, "Law and Religion: Historical and Philosophical Perspectives," Princeton University, Princeton, NJ, April 2009
- Discussant, "Natural Rights and the American Constitutional Experiment," Georgetown University, Washington, DC, January 2009

## LEADERSHIP IN CIVIC EDUCATION

- Curriculum Designer & Instructor, Seminars for 20-40 high school teachers, James Madison's Montpelier:
  - "Choice, Privacy, and American Constitutionalism" (3 days, 15 lecture hours, 2022)
  - "The Evolution of Rights in the American Constitutional Tradition" (Zoom, 3 days, 4.5 lecture hours, 2021)
  - "The Evolution of Rights in the American Constitutional Tradition" (3 days, 15 lecture hours, 2018)
  - "Religious Liberty and American Constitutionalism" (3 days, 7.5 lecture hours, 2016)

- Curriculum Designer and Faculty Instructor, "Religion and the Constitution," The Bill of Rights Institute. Designed and delivered three 60-minute lectures to a group of 40 high school teachers, July 25-26, 2016
- Faculty Instructor:
  - o Hertog Fellowship, two 3-hour seminars over two days, 2024
  - o 1789 Fellowship in American Political Thought and Practice, American Enterprise Institute, two 3-hour seminars over two days, 2022
  - o Civic Spirit Initiative, 2021-2024. Designed and taught three to five hours curricula on "faith and freedom" and "religious liberty and the Constitution" for 20 high school teachers
  - o Publius and John Marshall Fellowship Programs. Delivered four to six days of lectures on the American founding to recent college graduates annually, 2014-2024
  - o Jack Miller Center Ph.D. Student Summer Institute, 2019
  - o First Liberty Institute, 2021-22
  - o National Review Institute, 2022-2024
  - o Leonine Forum, 2020, 2022, 2024
- Faculty, Tikvah Institute
  - o Taught three-75 minutes sessions on the presidency and religion, 2022
  - o Created and taught a five-week zoom class on "Principles of American Constitutionalism," 2021-22
  - o Taught a five-week zoom class on "Lincoln's God" to middle school pupils, 2020
  - o Delivered three 2-hour lectures on the principles of American constitutionalism, 2013, 2014, 2020
- Course Development & Instructor, National Endowment for the Humanities—We the People Institutes for High School Teachers:
  - o Milwaukee, WI (1 day, 3.5 lecture hours, 2012)
  - o Princeton, New Jersey (3 days, 13.5 lecture hours, 2009)
  - o Anderson, Indiana (2 days, 4.5 lecture hours, 2009)
  - o Boise, Idaho (4 days, 18 lecture hours, 2005)
- Curriculum Development, National Endowment for the Humanities, EDSITEment Project, 2006-08
- Public/Invited Lectures on the Principles of American Constitutionalism and American History
  - o Blackstone Fellowship, 2017-18; Chesterton Society of Seattle, 2014; Discovery Institute, 2010, 2013; Napa Institute, 2014, 2015, 2019, 2020, 2021
  - o Notre Dame Hesburgh Lecture (Charlottesville, 2014), Cleveland (2012, 2013, 2015), San Diego (2015)
  - o South Bend/Notre Dame Area: Phoenix Institute (2012), DeBartolo Performing Arts Center (2012), St. Joseph Catholic Church (2014), Archdiocese of Ft. Wayne/South Bend (2019), University Faculty for Life (2022)

## SELECTIVE PODCAST & MEDIA APPEARANCES

- Podcast, *First Things*, December 15, 2022
- Podcast, Thomistic Institute: Aquinas 101, December 2022
- Podcast, James Madison's Montpelier, December 5, 2022
- Podcast, *Law and Liberty*, November 4, 2022
- Podcast, Anchoring Truths, October 2022
- Podcast, America's Talking, September 12, 2022
- Podcast, *National Review*: The Bookmonger, August 29, 2022
- Podcast, Intercollegiate Studies Institute, August 23, 2022
- Podcast, Andrew Klavan Show, August 19, 2022
- Podcast, *First Things*: The Editor's Desk, May 27, 2022
- Radio Show, Democracy Forum, WERU 89.9, November 19, 2021

- Podcast, National Constitution Center, September 30, 2021
- Print interview, *Christian Science Monitor*, July 10, 2020
- C-SPAN "Lectures in History" – Filmed on September 7, 2017; broadcast multiple times
- Tucker Carlson Tonight, Television Interview, March 28, 2017
- Tucker Carlson Tonight, Television Interview, March 24, 2017
- Print Interview, "Religious Freedom is Fundamental Principle," Krynica.Info, Belarusian Christian News, June 13, 2016
- Radio Interview, "Justice Scalia and the Supreme Court," Ave Maria Radio, Kresta in the Afternoon, Feb. 19, 2016
- Documentary Film Interviewee, *One Generation Away*, Ecolight Studios, 2014
- Radio Interview, "God & The Founders," Ave Maria Radio, Kresta in the Afternoon, Oct. 15, 2014
- Radio Interview, "Religious Liberty & the HHS Mandate," Ave Maria Radio, Kresta in the Afternoon, July 30, 2014
- Podcast Interview, "Catholic Bishops, Religious Liberty, & the HHS Mandate," Research on Religion, May 7, 2012
- Radio Interview, "Bishops Take on Obama," WOWO 1190AM Fort Wayne Morning News, April 26, 2012
- Television Interview, "Secularism and Religion in the US," Turkish Radio and Television (TRT), June 2009

### DOCTORAL DISSERTATION COMMITTEES AT NOTRE DAME

- Fr. Henry Stephen, ABD, Civic Friendship
- Tyler Moore, 2022, "Interpretation's Disputed Terrain"
- Tiernan Kane, 2022, "Reevaluating Legal Liberty of Conscience" (Chair)
- Bradley Rebeiro, 2021, "Natural Rights (Re)Construction: Frederick Douglass and Constitutional Abolitionism" (Chair)
- Robert Burton, 2020, "The Early Modern Conscience"
- Raul Rodriguez, 2020, "Tocqueville's New Kind of Liberalism"
- Kevin Vance, 2017, "American Religious Liberty Jurisprudence in Comparative Perspective"
- Christopher McMillian, 2016, "Federalism and Freedom: The Precedential and Normative Roots of the Rehnquist Court's Federalism Revolution"
- Matthew Van Hook, 2015, "Alexander Hamilton: A Theory of Statesmanship"
- Ryan Anderson, 2014, "Neither Liberal Nor Libertarian: A Natural Law Approach to Social Justice and Economic Rights"

### UNDERGRADUATE THESES DIRECTED AT NOTRE DAME

- Sierra Stinson, 2022-23, "A Close Examination of Affirmative Action at Notre Dame: The Effects on Minority Students"
- Patrick Aimone, 2021-22, "At the Border of Church and State: A Defense of Religious Accommodation of the Sanctuary Movement"
  Recipient of the Paul Bartholomew Prize for best senior thesis in political theory
- Hannah Lovejoy, 2019-20, "You are What You Eat: Classical Ethics and Education for 21st Century American Youth"
- John Paul L. Ferguson, 2019-20, "Republican Statesmen: The Political Philosophy of Cicero and Alexander Hamilton"

14

- Pedro Dominguez, 2018-19, "An Apple of Gold: On the Statesmanship of Abraham Lincoln"
- Mary Soren Hansen, 2018-19, "Girl Power: A Tocquevillian Analysis of the Crisis of Gender Among Millennials"
- Jack Puetz, 2017-18, "Justice Scalia's Church-State Jurisprudence: An Analysis of Nino's Notions of the Role of the Religion Clauses of the First Amendment"
- Cole Wintheiser, 2016-17, "One Nation Under God: An Examination of Clarence Thomas's Evolving Establishment Clause Jurisprudence"
- Neil Joseph, 2016-17, "To Speak or Not to Speak: Why Universities Promote or Restrict Free Expression on Campus" – Recipient of the Paul Bartholomew Prize for best thesis in political theory – 2016-2017
- Alexandra DeSanctis, 2015, "Free Love: Sexual Autonomy and the American Family"
- Scott Englert, 2012-13, "South Bend and the Establishment Clause"
- Sarah Durzik, 2011-12, "The Development of Criminal Defendants' Rights"

## COURSES TAUGHT

- University of Notre Dame
  - American Constitutional Theory and Development (graduate and law)
  - American Political Thought
  - Conservatism After Trump
  - Constitutionalism, Law & Politics I: Constitutional Government & Public Policy
  - Constitutionalism, Law & Politics II: The American Constitutional Tradition
  - Constitutional Law I - National Powers
  - Constitutional Law II - Civil Liberties
  - Core Texts in Citizenship & Constitutional Government: Modern Constitutionalism
  - Democracy & Virtue? (with David O'Connor - seminar on Plato's *Republic* and Tocqueville's *Democracy in America*)
  - Human Excellence and the Political Order
  - Law, Morality, and Democracy
  - Lincoln's Political Thought and Statesmanship (with Michael Zuckert)
  - Program of Liberal Studies - Political & Constitutional Theory
  - Race and American Constitutionalism (with Judge Amul Thapar)
  - Religion and American Constitutionalism (with Justice Clarence Thomas)
  - Religion, the State, and American Constitutionalism (graduate, law, undergrad seminar and lecture)
- Tufts University
  - Civil Liberties
  - The Meaning of America
  - Religion, the State, and the Constitution
  - Democracy, Law, and Moral Politics
- North Carolina State University
  - Introduction to Political Philosophy
  - Law and Justice
  - Religion, the State, and the Constitution
  - Constitutional Law: Civil Rights
- Claremont McKenna College—DC Program
  - Law, Morality, and Public Policy
- Pomona College
  - The Philosophy and Politics of Liberal Arts Education
  - The American Presidency
  - Constitutional Law I: National Powers & Constitutional Law II: The Bill of Rights
- California State University, San Bernardino
  - American Political Thought
  - The Judicial Process
  - Constitutional Law II: The Bill of Rights & Constitutional Law III: Civil Liberties
  - Formation of Public Policy

## SELECTIVE PROFESSIONAL SERVICE IN POLITICAL SCIENCE

- American Political Science Association - American Political Thought Section
  - 2024 – Lifetime Achievement Award Committee
  - 2019-23 – Section Treasurer/Secretary
  - 2018 – Book Award Committee Chair
  - 2016 – APSA Annual Meeting Panel Co-Chair – Organized five panels for the 2016 Convention
- Journal Editorial Board Member: *American Political Thought*; *Journal of Religion, Culture & Democracy*
- APSA Book Award Committee: Religion and Politics (2012)
- Manuscript Referee: *American Journal of Legal History*, *American Journal of Political Science*, *American Political Science Review*, *American Political Thought, Journal of Church & State, Journal of Politics, Polity, Political Science Reviewer*, *Religion and Politics, Review of Politics*, *Yale Law Journal*, AEI Press, Cambridge University Press, Northern Illinois University Press, Oxford University Press, Palgrave, Princeton University Press, Rowman & Littlefield, University of Chicago Press, University of Kentucky Press, University of Kansas Press, University of Notre Dame Press
- Grant Proposal Evaluator: Earhart Foundation, National Endowment for the Humanities—We the People Landmarks of American History and Culture Program, Templeton Foundation, Notre Dame Institute for Advanced Study

## UNIVERSITY SERVICE AT NOTRE DAME

- Founding Director, Center for Citizenship & Constitutional Government (2021-present)
- Director, Tocqueville Program in Religion & Public Life (2011-2021)
- Founding Director, Constitutional Studies Interdisciplinary Minor (2011-present)
- University Commencement Committee – Selection of Valedictorian Speaker (2013)
- College of Arts & Letters
  - Honesty Committee (Chair, Spring 2013-Spring 2015), (Member, 2012)
  - Catholicism Across the Disciplines – Implementation Committee (2017)
- Department of Political Science:
  - Ad hoc committee on Standards for Tenure and Promotion (2022-23)
  - Constitutional Studies Field Chair (2023-24, 2021-22, 2018)
  - Executive Committee of the Whole (2015-18)
  - Graduate Admissions Committee (2020, 2016, 2015, 2011)
  - Graduate Policy Committee (2022-23, 2013, 2009-10)
  - Search Committee, American Politics (2012-13)
  - Search Committee Chair, Constitutional Studies (2018-19, 2011-12)
  - Self-Study Committee (2011-12)
  - Undergraduate Policy Committee (2017-18, 2012-13)
- Student Club Faculty Advisor
  - *The Irish Rover* (2013-present)
  - Young Americans for Freedom (2017-present)
  - ND Votes (2017-2021)

| DOCUMENTS PROVIDED BY DEFENDANTS' COUNSEL TO VINCENT PHILLIP MUÑOZ, PH.D. |
|---|
| Plaintiff's First Amended Complaint (Dkt. 29) |
| Ninth Circuit decision, Bolden-Hardge v. Office of the Cal. State Controller (Dkt 44) |
| Brief of Profs. Daniel Conkle, Richard Garnett, Douglas Laycock, Michael McConnell, Gregory Sisk, and Nelson Tebbe as Amici Curiae in Support of Plaintiff-Appellant filed in Ninth Circuit. (Dkt 17) |
| Defendants/Appellees' Answering Brief, filed in Ninth Circuit (Dkt 23) |
| Girouard v. U.S. (1946) 328 U.S. 61 |
| Plaintiff's Initial Expert Disclosures Pursuant to FRCP 26 |

## <u>DECLARATION OF SERVICE BY E-MAIL</u>

Case Name:    **Brianna Bolden-Hardge v. Office of the California State Controller, et al.**
No.:          **U.S. District Court – Eastern District Case No. 2:20-cv-02081-JAM-SCR**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.

On <u>November 25, 2024</u>, I served the following:

1.  **DEFENDANTS' <u>AMENDED</u> NOTICE OF DESIGNATION OF REBUTTAL EXPERTS**

by transmitting a true copy via electronic mail, addressed as follows:.

James A. Sonne, Esq.
Zeba Azim Huq, Esq.
Stanford Law School Religious Liberty Clinic
559 Nathan Abbott Way
Stanford,  CA  94305-8610

**E-mail Address**:
 jsonne@law.stanford.edu
zebahuq@law.stanford.edu

*Attorneys for Plaintiff*
*Brianna Bolden-Hardge*

Wendy E. Musell, Esq.
Law Offices of Wendy Musell PC
66 Franklin Street, Suite 300
Oakland,  CA 94607

**E-mail Address**:
mwillits@wendymuselllaw.com
wmusell@wendymuselllaw.com

*Attorney for Plaintiff*
*Brianna Bolden-Hardge*

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on November 25, 2024, at Berkeley, California.

| John T. McGlothlin | John McGlothlin |
|---|---|
| Declarant | Signature |

OK2020900414
91920470.docx

# CERTIFICATE OF SERVICE

Case Name:   ***Brianna Bolden-Hardge v.***          No.     **2:20-cv-02081-JAM-SCR**
                 ***Office of the California State***
                 ***Controller, et al.***

I hereby certify that on <u>August 27, 2025,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**NOTICE OF ERRATA REGARDING DEFENDANTS' OFFICE STATE CONTROLLER, BETTY YEE, MALIA COHEN, AND GERARD ANDERSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND CROSS-MOTION FOR SUMMARY JUDGMENT MOTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>August 27, 2025,</u> at Oakland, California.

|  |  |
|---|---|
| Leticia Martinez-Carter | *Leticia Martinez-Carter* |
| Declarant | Signature |

OK2020900414
92026597.docx